UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark Paul SARNO, Defendant–Appellant.

No. 93–5109.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 10, 1993.

Decided May 19, 1994.

Before WIDENER, MURNAGHAN and NIEMEYER, Circuit Judges.

Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge MURNAGHAN and Judge NIEMEYER concurred.

## OPINION

WIDENER, Circuit Judge:

Defendant Mark Paul Sarno appeals his convictions and sentence for conspiracy to escape from the Federal Correctional Institution in Morgantown, West Virginia (Morgantown FCI), in violation of 18 U.S.C. § 371, and the substantive offense of escaping, in violation of 18 U.S.C. § 751(a). Sarno asserts that the district court erred by precluding him from presenting a duress defense at trial and also claims a violation of his right to a speedy trial. Sarno appeals his sentence, claiming the district court erred in its application of an enhancement for Sarno's role in the offense as an organizer, and in determining that escape from Morgantown FCI did not qualify for a reduced base offense level pursuant to U.S.S.G. § 2P1.1(b)(3). We affirm both the convictions and the sentence.

On August 19, 1988, Mark Sarno was sentenced to 46 months for various federal bank, mail, and wire fraud convictions. While at a holding unit in Lewisburg, Pennsylvania, he became friendly with another inmate, Daniel Spengler. They continued this friendship while both served their sentences at Morgantown FCI. In late May of 1991, Spengler opened a brokerage account with $20,000 that Sarno had obtained from Penny Mayfield, a fellow inmate, and deposited in Spengler's girlfriend's bank account. The money was to be used to start a business trading currencies and belonging to Sarno and Spengler.

Spengler was to be released to a half-way house and approximately one month prior to Spengler's release, Sarno told Spengler that he could no longer stay in prison. Sarno and Spengler planned for Sarno to escape from the prison with Spengler's help. Spengler was to return to Morgantown FCI after his release and pick up Sarno from an area

**ARGUED:** Stephen Godfrey Jory, Jory & Smith, Elkins, WV, for appellant. Sherry L. Muncy, Asst. U.S. Atty., Elkins, WV, for appellee.

**ON BRIEF:** William A. Kolibash, U.S. Atty., Elkins, WV, for appellee.

where Sarno couldn't be seen by guards. Sarno planned to signal his presence to Spengler by throwing a yellow sock in front of the bushes where he would be hiding so that Spengler would know to stop the car and let Sarno in. Since the prison monitored telephone calls, they set up a telephone code whereby Sarno and Spengler could surreptitiously discuss the proposed date and exact time that Spengler would return to pick him up outside the prison. Morgantown FCI released Spengler to a half-way house in Boston, Massachusetts, on May 30, 1991. Sarno called Spengler and, using the telephone code, Spengler informed him that he would return to Morgantown FCI to pick him up on June 3, 1991. Spengler flew to Pittsburgh, rented a car, and drove to Morgantown FCI. Sarno used another inmate, Russell Massey, to act as lookout for his escape. Sarno talked to Massey about misleading the authorities as to where to look for the escaped Sarno. He also talked to Massey's sister-in-law about telephoning her after his escape in order to find out in which direction the authorities were looking. After Sarno walked off the prison grounds, he hid in the designated spot and threw the yellow sock out as planned and Spengler picked him up. The two drove back to Pittsburgh and flew to Boston, where Sarno stayed in area hotels until arrested on July 8, 1991.

During his 35–day absence from federal custody, Sarno started and operated a currency trading company called Cambridge Currency Investments, using the $20,000 brokerage account set up in May. Sarno signed documents on behalf of Cambridge Currency, using the alias of Victor Troiano, who was Sarno's deceased cousin. After his escape, Sarno had flown to Troiano's mother's house and obtained Victor's birth certificate and social security card for identification. Sarno also rented pagers so that he could keep in close contact with Spengler and have some advance warning if Spengler was arrested and unable to call him back. Spengler told his halfway house that Cambridge Currency was his employer, so that he was able to leave the halfway house daily.

After his apprehension on July 8, 1991, Sarno told federal authorities that he had escaped because of duress while he was in prison imposed by one Patty Wells, a correctional officer at Morgantown FCI and wife of a prison administrator whose position was similar to that of a deputy warden. Prior to Sarno's trial, the government filed a motion in limine to exclude Sarno's duress defense at trial. A hearing was held before a magistrate judge, who heard testimony from Sarno and a tape recording of a post-arrest conversation between Sarno and Spengler where Sarno said if the arresting officer hadn't had his gun drawn Sarno would have run. The magistrate judge recommended to the district court that the duress defense be precluded because, as a matter of law, the defendant could not establish one of the elements of the defense, that he made a bona fide effort to surrender to the proper authorities as soon as the claimed duress lost its immediate coercive force. The magistrate's Proposed Findings of Fact and Recommendation for Disposition considered dispositive the fact that Sarno never contacted the proper authorities regarding surrender during his 35–day absence from the prison, despite his claims that he was about to turn himself in and had contacted a private attorney in order to do so. After Sarno objected to the magistrate's recommendation, the district court held:

> [The] evidence rather conclusively establishes that the defendant made no bona fide effort to surrender to the proper authorities as soon as the claimed duress lost its immediate coercive effect. Accordingly, as a matter of law, the defendant cannot satisfy an essential element of the duress defense, and he will be precluded from presenting evidence of duress to the jury. *See, United States v. Bifield,* 702 F.2d 342, 345–46 (2d Cir.1983), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

*United States v. Sarno,* No. 91–133–01 (N.D. W.Va., September 30, 1992) (order granting the Government's Motion in Limine as to any evidence in support of defendant's proposed duress defense).

Pursuant to this order and on the same day it was signed, the Government filed a motion seeking to quash the subpoenas of seven witnesses the defense had intended to

use to establish a duress defense. After a hearing on the motion, held on October 1, 1992, the district court ordered the subpoenas quashed, again ruling that the duress defense was unavailable as a matter of law.[1]

At trial, Sarno made a proffer of proof on the duress defense. The evidence, if believed, would have established that Sarno was having an affair with prison guard Patty Wells. Mrs. Wells asked Sarno for $500 to help him in getting a furlough. Sarno's parents sent the money to Mrs. Wells. The furlough was denied, so Mrs. Wells did other favors for Sarno, such as obtain a radio and special clothing for him in prison. Another $500 was sent to Mrs. Wells by Sarno's parents, at Sarno's request. Wells continued to pressure Sarno for sexual encounters and more money so that Sarno felt that he was the victim of a shakedown. At the same time, Sarno became aware that Mr. Wells was aware of his relationship with Mrs. Wells and Sarno felt that he was at risk of harm because of the situation.

Considering the complete record of the two hearings already held and the proffer, the district court determined that, even if the situation at Morgantown FCI legally constituted duress, Sarno did not surrender to authorities as soon as he could after escaping the duress. The district court noted that he could have surrendered to the U.S. Marshals Service in Pittsburgh or Clarksburg, immediately after his escape, but did not do so. Since Sarno could not, as a matter of law, prove one of the elements of his defense, the district precluded him from presenting any evidence at trial pertaining to duress.

## I.

Sarno claims a due process violation because the district court precluded him from testifying or calling witnesses to testify before the court and the jury concerning the extent of duress under which he suffered. He maintains that his consulting an attorney,

weeks after his escape but in anticipation of surrendering, makes a triable issue of fact of the element of a bona fide effort to surrender.

■ As the district court properly noted, one of the elements of the affirmative defense of duress to a prosecution pursuant to 18 U.S.C. § 751(a) is that of a "bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *United States v. Bailey*, 444 U.S. 394, 413, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980) (emphasis added). Whether an affirmative defense is established is a factual issue that is usually a function of the jury, and the trial court rarely rules on a defense as a matter of law. However, where there is insufficient evidence, as a matter of law, to support an element of the affirmative defense, the defendant can be precluded from presenting any evidence of duress to the jury or, if some evidence is already presented at trial, the court can refuse to instruct the jury on the duress defense. *Bailey*, 444 U.S. at 414, 416, 100 S.Ct. at 636–37, 637–38. Thus, the Supreme Court in *Bailey* affirmed convictions under 18 U.S.C. § 751(a) against defendants in a case where the district court refused to submit the duress defense to the jury, despite evidence presented concerning the bad conditions of their federal confinement as a reason for their escape, because the defendants could present no evidence regarding the element of timely surrender. In so holding the Court stated:

> If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

*Bailey*, 444 U.S. at 416, 100 S.Ct. at 638.

■ Sarno's contentions, that his alleged efforts to surrender created a triable issue as

---

1. Sarno argued at the hearing on this motion that the seven witnesses would be used to establish an entrapment defense at trial and not a duress defense. The district court rejected the entrapment defense as inextricably intertwined with the defense of duress and determined that

both defenses were unavailable to the defendant as a matter of law. *United States v. Sarno*, No. 91–133–01 (N.D. W.Va., October 5, 1992) (order quashing subpoenas). No question on appeal is raised with respect to entrapment.

to that element and that he should have been able to present evidence to the jury on all elements of his duress defense, have no merit in the face of *Bailey*. *Bailey* approves the exclusion of evidence at trial of other elements of the duress defense if timely surrender is not proved. We are of opinion that Sarno's 35–day absence from federal custody, coupled with his failure to turn himself in despite many opportunities, conclusively establishes that his claimed attempt to discuss surrender with an attorney does not meet the timeliness requirements of the element. The district court, having correctly determined that Sarno's evidence could not support the element of timely surrender, properly excluded any testimony at trial as to the duress defense.

## II.

■ Sarno's arraignment was on December 10, 1991, and he filed a Motion for a Speedy Trial on February 26, 1992. After continuances were granted to Sarno on April 27, 1992 and to Spengler on June 5, 1992, the trial date was set for July 16, 1992, a date which Sarno did not and does not object to on Speedy Trial grounds. However, Sarno filed a motion to sever on June 9, 1992, requesting either trial on July 16, 1992 or severance based on a continuance that might be necessitated by another co-defendant's pending request to replace her defense counsel. Sarno claims prejudice by the continuances because he was losing good-time deductions from his pre-existing federal sentence while awaiting trial on the escape charges. The District Court denied Sarno's severance request on July 6, 1992 and the trial eventually commenced on October 5, 1992.

Sarno claims that, while technically not a Speedy Trial Act violation, the cumulative effect of the continuances in this case violated the spirit of the Speedy Trial Act because

the delay was unreasonable and worked to the defendant's prejudice in his loss of good-time deductions while awaiting trial on the escape charge. Sarno's claim is without merit and requires little discussion. We review *de novo* any legal conclusions in the district court's application of the Speedy Trial Act. See *United States v. Wright*, 990 F.2d 147, 148 (4th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 199, 126 L.Ed.2d 157 (1993).

The continuances granted Sarno's co-defendant were properly applicable to Sarno under 18 U.S.C. § 3161(h)(7), which excludes from the computation of time within which a trial must commence: "A reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted." Sarno's co-defendant's pretrial motion to replace counsel resulted in a continuance properly granted and excludable from speedy trial act computations under 18 U.S.C. § 3161(h)(8)(A),[2] and this exclusion could also be applied to Sarno under section 3161(h)(7) since Sarno's motion for severance was not granted. Moreover, Sarno does not appeal the denial of his motion for severance as error. Therefore, we are of opinion that exclusion from speedy trial computations of the period of the continuance was entirely proper in this case. See *United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir.1986) (holding that, where denial of severance was not abuse of discretion, any delay resulting from the joinder of defendant's trial with co-defendant was properly excluded under 18 U.S.C. § 3161(h)(7)), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

## III.

■ Sarno claims that the district court erred in enhancing his sentence, pursuant to U.S.S.G. § 3B1.1(c).[3] We review such an application of the Sentencing Guidelines for

---

**2.** 18 U.S.C. § 3161(h)(8)(A), in relevant part, provides for exclusion for:

Any period of delay resulting from a continuance granted by any judge ... at the request of the defendant or his counsel ... if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of

the public and the defendant in a speedy trial. . . .

**3.** This section provides for a two level increase in base offense level if the defendant was an organizer, leader, manager, or supervisor in any criminal activity involving less than 5 participants or which is not otherwise extensive.

clear error, See 18 U.S.C. § 3742(e) (1988); *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989). We are of opinion that the district court's determination that Sarno was an organizer in the offense is not clearly erroneous, considering the evidence that Sarno was the beneficiary of the offense; first brought up the matter of his escape to Spengler; persuaded Spengler, Massey, and Massey's sister-in-law for help with the escape; and devised many of the details of the escape, such as the telephone code used to plan the date of the escape and the yellow sock to signify his presence for pick up. The fact that Spengler also helped to organize the escape does not, in this case, preclude Sarno from being held accountable as an organizer.

## IV.

 As the final issue on appeal, Sarno asserts· that the district court erred in denying him a reduction pursuant to U.S.S.G. § 2P1.1(b)(3), which specifies a four-level decrease in the base offense level of 13 for a violation of 18 U.S.C. § 751(a), if the "defendant escaped from the non-secure custody of a community corrections center, community treatment center, 'half-way house,' or similar facility." Application note 1 to section 2P1.1

defines non-secure custody as "custody with no· significant physical restraint (*e.g.,* ... where a defendant escaped from an institution with no physical perimeter barrier.)" Sarno claims that Morgantown FCI fits the definition of non-secure facility, even though it has a fence as a physical perimeter barrier, because that fence is only four feet high and easily scaled. Sarno asserts that minimum security prisons and prison camps are nonsecure facilities under the Guidelines and, without any further demonstration of similarity to community based correctional facilities, escape from such institutions would warrant the base offense level reduction. Our review of the interpretation of a sentencing guideline provision is *de novo, Daughtrey,* 874 F.2d at 217.

We have not previously construed section 2P1.1(b)(3), but every Court of Appeals interpreting this section has construed the Guideline literally and applied a two-part test in determining whether the reduction applies: first, the escape must be from a non-secure facility and, second, that non-secure facility must be similar to a community corrections center, community treatment center or half-way house.[4]

4. See, e.g., *United States v. Cisneros–Garcia,* 14 F.3d 41 (10th Cir.1994) (holding that Leavenworth Federal Prison Camp was non-secure, but was not similar to community correctional centers); *United States v. Hillstrom,* 988 F.2d 448 (3d Cir.1993) (where defendant escaped from work detail outside Allenwood Federal Prison Camp which parties did not dispute was non-secure, the court held that the first prong was met, but remanded for further consideration, under the second prong of the test, the purpose, security policies, and safety ramifications of Allenwood as compared to community corrections centers); *United States v. Hillstrom,* 837 F.Supp. 1324 (M.D. Pa.1993) (deciding on remand that Allenwood Prison Camp was not similar to community based correctional institutions); *United States v. Tapia,* 981 F.2d 1194 (11th Cir.) (holding that defendant's escape from work detail outside of perimeter fence of Maxwell Federal Prison Camp was an escape from a non-secure facility, but federal prison camps are not similar facilities within the meaning of § 2P1.1(b)(3)), *cert. denied,* — U.S. ——, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993); *United States v. Shaw,* 979 F.2d 41 (5th Cir.1992) (in applying two-prong test, held that an escape from Three Rivers Federal Prison Camp may have been an escape from a non-secure facility, but that facility was not similar to the community-based facilities listed in

§ 2P1.1(b)(3)); *United States v. Brownlee,* 970 F.2d 764 (10th Cir.1992) (although conceding that Leavenworth Federal Prison Camp may very well provide non-secure custody as defined in Guidelines, held that a federal prison camp is not similar to community facilities in that it is not integrated into the community); *United States v. McGann,* 960 F.2d 846 (9th Cir.) (holding that reduction may be granted only where facility is both non-secure and similar in kind to the community facilities listed in 2P1.1(b)(3) and determined that federal prison camps such as the one at Lompoc, California, were generically different), *cert. denied,* — U.S. ——, 113 S.Ct. 276, 121 L.Ed.2d 204 (1992). We also specifically note that both district court opinions relied on by Sarno that utilize only the first prong of the test have been overruled. *United States v. Crosby,* 762 F.Supp. 658 (W.D. Pa.1991) was explicitly overruled by *Hillstrom,* 988 F.2d at 451, n. 2, and *United States v. Agudelo,* 768 F.Supp. 339 (N.D. Fla.1991), was impliedly overruled by the adoption of the two-prong test by the Eleventh Circuit in *Tapia,* 981 F.2d 1194 (11th Cir.1993). All of the cases considering this question which have dealt with federal prison camps with the lowest security rating of minimum have concluded that the facilities, while non-secure, are not similar to community based facilities.

We are of opinion and hold that the two-prong inquiry is appropriate under section 2P1.1(b)(3). In determining whether Morgantown FCI is non-secure, we are faced with a record that describes Morgantown FCI as a minimum-security prison with a four foot high perimeter fence and perimeter road that inmates are warned not to cross. Morgantown FCI was described as being a more secure facility than a federal prison camp, and contained a pretrial unit and a detention facility for inmates. Sparse as this description is, it is sufficient to determine that Morgantown FCI fits squarely within the Guidelines' definition of secure facility because it has a significant physical restraint in the form of a physical perimeter barrier which is a fence, even though that fence is only four feet high.

Having decided that Morgantown FCI is a secure facility, we need not consider the second prong of the test, that is whether it is similar to a community correction center, community treatment center, or half-way house.[5]

Accordingly, the defendant's convictions and sentence are

*AFFIRMED.*

---

5. We note, however, that the courts comparing federal prison camps to community-based facilities have determined that they are not similar. See *supra* at n. 4.