UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 95-5584

JAIME RODRIGUEZ, a/k/a Jose Rivera,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CR-92-36)

Argued: January 29, 1998

Decided: June 29, 1998

Before HAMILTON, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward Anthony Fiorella, Jr., HARKEY, LAMBERTH,
NYSTROM, FIORELLA & MORRISON, L.L.P., Charlotte, North
Carolina, for Appellant. Kenneth Davis Bell, OFFICE OF THE
UNITED STATES ATTORNEY, Charlotte, North Carolina, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Jaime Rodriguez appeals his conviction for conspiracy to distribute cocaine base (crack). He contends that the district court erred by (among other things) admitting evidence of his prior bad acts. Rodriguez also claims that the evidence was insufficient to support his conviction and that he was denied his right to a speedy trial. Having considered Rodriguez's arguments, we conclude that the district court did not abuse its discretion in admitting evidence of his prior bad acts because that evidence was necessary to prove the element of intent. Further, we are convinced that the evidence at trial was sufficient to prove beyond a reasonable doubt that Rodriguez joined a cocaine distribution conspiracy centered in the Western District of North Carolina. Moreover, we hold that Rodriguez was not denied his right to a speedy trial because much of the delay in bringing him to trial resulted from continuances granted to him and his co-defendants. Accordingly, we affirm Rodriguez's conviction.

I.

Rodriguez was indicted on February 6, 1992, in the Western District of North Carolina for conspiracy to possess with intent to distribute crack. A superseding indictment handed down March 3, 1992, named several new defendants. Trial was originally set for the March 1992 trial term, but Rodriguez's co-defendants repeatedly moved for continuances and the trial was continued until the April 1993 trial term. Rodriguez himself moved for two two-month continuances, asking that trial be continued from May to July 1992 and from July to September 1992. Rodriguez went to trial on March 29, 1993.

At trial Emery Evans testified about his crack distribution operation in Mecklenburg and Union Counties in the Western District of North Carolina. Evans testified that he originally obtained his cocaine

from his friend Juan Escobar in North Carolina. Evans said that Escobar bought this cocaine from Jose Barrena, a drug dealer who operated out of Miami, Florida. Barrena, in turn, got much of this cocaine from Guillermo Cortina, whose family had a large cocaine distribution operation in Miami. The cocaine Evans bought from Escobar was packaged and distributed by Evans in North Carolina.

Although at first Escobar was Evans' only source for cocaine, Evans soon began to buy cocaine directly from Barrena, to cut out the middleman (Escobar). Cortina continued to supply Barrena with most of the cocaine that was sold to Evans. Evans obtained this cocaine by driving to Miami and then transporting it back to North Carolina where it was put on the retail drug market.

Barrena also testified at Rodriguez's trial. Barrena explained that he obtained most of the cocaine he sold to Escobar from Cortina. Barrena's contact with Cortina was through his (Barrena's) brother Miguel, who knew Cortina from Columbia. Usually, Escobar would travel to Barrena's apartment in Florida to buy the cocaine, which Cortina had "fronted" to Barrena. After the transaction Barrena would call Cortina, who would come to Barrena's apartment and pick up his money. After Barrena began selling cocaine directly to Evans, he still got most of his cocaine from Cortina.

In January 1992 DEA Agents arrested Evans in North Carolina. Evans immediately began cooperating with the government. He called Barrena and asked for 30 kilos of cocaine. Barrena decided to obtain the 30 kilos from Cortina, because Barrena had recently delivered some bad cocaine from Cortina to Evans, and Cortina had promised to make it up to Evans on a later deal.

On January 29, 1992, Evans and the DEA agents went to Florida to buy the cocaine from Barrena. Once he arrived in Miami, Evans drove to Barrena's apartment. There, Barrena and his brother Miguel were waiting for Evans in the parking lot. Barrena gave Evans 15 kilos of cocaine and told Evans that the other 15 kilos were in his car. As they were walking to Barrena's car, the DEA agents arrested Barrena. Miguel escaped, however.

Barrena immediately began cooperating with the DEA. Cortina had fronted him the 30 kilos of cocaine, so he called Cortina and told him

3

to pick up his money. Barrena told DEA agents that Cortina said he was bringing an associate with him to pick up the money.

Cortina arrived at Barrena's apartment with Rodriguez. When he arrived on the scene, Rodriguez asked "Where's Miguel?" Cortina and Rodriguez were then arrested by DEA agents. The agents found a loaded semi-automatic pistol on Cortina and found two more semi-automatics in the car that Rodriguez and Cortina had driven to Barrena's apartment. After being read his Miranda rights, Rodriguez admitted to the agents that he owned both of the firearms found in the car.

At trial Angel Oropeza, a government informant, testified about his drug activities in Miami with a man named "Jimmy." Oropeza testified that he met with Jimmy about buying some cocaine in late 1991. Two other men accompanied Jimmy to that meeting. Oropeza later identified Jimmy as Rodriguez from police photographs. At trial Oropeza again identified Rodriguez as Jimmy and also identified Cortina as one of the men who accompanied Rodriguez to their 1991 meeting.

DEA Agent Jaime Camacho also testified at trial. Camacho explained how he and Oropeza met with Jimmy's agent to arrange the purchase of 50 kilos of cocaine. Jimmy's agent provided a sample kilo to Camacho and then Oropeza and Jimmy attempted to work out the details of the sale. The deal never was consummated, however, apparently because Jimmy (Rodriguez) learned that he was being watched by DEA agents.

The jury found Rodriguez guilty. After trial he pleaded guilty to another charge of conspiracy to distribute cocaine arising out of his activities in Miami (the indictment was handed down while he was awaiting trial in North Carolina). Rodriguez was sentenced to 210 months in prison for the Florida conviction and later to 262 months for the North Carolina conviction (his offense level having been enhanced due to the Florida conviction).

Rodriguez filed his notice of appeal on July 10, 1995. His appeal was delayed, however, because his lawyer was unable to obtain a transcript of his trial from the court reporter despite our repeated

directives to the reporter to produce the transcript. On June 19, 1997, we remanded the case to the trial court for completion of the record for appeal. That court adopted the transcript prepared for co-defendant Cortina's appeal as an accurate transcript of Rodriguez's trial (since Cortina and Rodriguez were tried together) and forwarded it to this court on July 16, 1997. Thereafter, counsel were able to file briefs, and argument was scheduled.

II.

A.

Rodriguez claims that the testimony concerning his prior drug dealing in Miami with Oropeza and Agent Camacho was evidence of prior bad acts, which is generally inadmissible under Federal Rule of Evidence 404(a). Of course, evidence of a defendant's prior bad acts may be admitted to prove an element (such as intent) of the crime charged, so long as the evidence is not used to show that the defendant possessed bad character and acted in conformity therewith. See Fed. R. Evid. 404(b); United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997), cert. denied, 118 S. Ct. 1572 (1998). Rodriguez contends that the testimony about his prior drug dealing with Oropeza and Agent Camacho was not admissible under Rule 404(b) because it was unrelated to the North Carolina conspiracy. Here, Rodriguez confuses "extrinsic" acts, which fall under Rule 404(b)'s prohibition on evidence of bad character, with "intrinsic" acts, which are not subject to Rule 404(b). Prior acts are extrinsic if they are neither an element of the crime charged nor "inextricably intertwined" with that crime. See United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996). Intrinsic acts, on the other hand, are actually part of the crime charged (such as acts in furtherance of a conspiracy) or so closely related to the crime that its "story" cannot be told without mentioning them. See id. Here, there is no question that the prior bad acts about which Oropeza and Agent Camacho testified were unrelated to the crime with which Rodriguez was charged. Yet Rodriguez's prior acts were not rendered inadmissible because they were extrinsic to the North Carolina conspiracy. That the acts were extrinsic simply meant that testimony concerning them had to meet the requirements of Rule 404(b) in order to be admissible.

5

Evidence is admissible under Rule 404(b) if: (1) it is relevant to an issue other than character, (2) it is necessary to prove an element of the crime charged, (3) it is reliable, and (4) its probative value is not substantially outweighed by its prejudicial effect in violation of Federal Rule of Evidence 403. See Queen, 132 F.3d at 995. We review the admission of evidence under Rule 404(b) for an abuse of discretion. See United States v. Sanchez, 118 F.3d 192, 195 (4th Cir. 1997).

We conclude that the district court was well within its discretion when it admitted the evidence of Rodriguez's prior drug activity under Rule 404(b). Oropeza and Agent Camacho testified that Rodriguez had previously engaged in cocaine distribution with (among others) Cortina. This evidence that Rodriguez was involved in prior drug transactions was probative of his intent to take part in the drug transaction between Barrena and Cortina on January 29, 1992.[1] This evidence was necessary because the government had to prove that Rodriguez was an active participant, and not an innocent bystander, in the January 29 transaction in order to prove that he joined the North Carolina cocaine distribution conspiracy. The evidence was reliable because Oropeza twice identified Rodriguez. (Indeed, it is not surprising that Rodriguez would have been known as "Jimmy" since the name Jaime is Spanish for James.) Further, Rodriguez's claim that

_____

[1] Of course, prior bad acts are not relevant to prove mental state if they are too dissimilar to the crime charged. See Queen, 132 F.3d at 997; see, e.g., United States v. Hernandez, 975 F.2d 1035, 1040 (4th Cir. 1992); United States v. Sanders, 964 F.2d 295, 298-99 (4th Cir. 1992). This is because evidence of dissimilar prior bad acts is just proof of bad character and the propensity to commit crime. See Queen, 132 F.3d at 996-97. However, even if the prior bad acts proved at trial are not the same as the crime with which the defendant is charged, the prior acts may be admissible if the state of mind they evidence is the same state of mind required to prove the crime charged. See id. Here, the mental state evidenced by Rodriguez's prior drug activities, the intent to engage in cocaine distribution with others, is the same mental state the government was trying to prove to convict Rodriguez of conspiracy. Thus, even though Rodriguez's prior bad acts (arranging a drug sale) were slightly dissimilar to the act he was charged with (collecting money after a drug sale), the prior acts met the similarity requirement of Rule 404(b).

6

the introduction of this evidence caused him unfair prejudice is completely unsupported.**2**

B.

Next, Rodriguez contends that the evidence at trial was insufficient to support his conviction. We must uphold his conviction unless, taking all the evidence in the light most favorable to the government, a reasonable jury could not have found the essential elements of the crime beyond a reasonable doubt. See Glasser v. United States, 315 U.S. 60, 80 (1942). The elements of conspiracy to possess crack with intent to distribute are: (1) an agreement between two or more persons to possess crack with intent to distribute it, (2) knowledge of the conspiracy by the defendant, and (3) a knowing and voluntary decision by the defendant to join the conspiracy. See United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc), cert. denied, 117 S. Ct. 1087 (1997). Thus, to convict a defendant of conspiracy to distribute crack, the government must prove beyond a reasonable doubt both the existence of the conspiracy and the defendant's connection to the conspiracy. See id. at 858.

Rodriguez does not challenge the government's proof of the existence of the North Carolina conspiracy. Indeed, the evidence on this point was overwhelming. Evans bought his cocaine from two suppliers, Escobar and Barrena, in North Carolina and Florida. Further, although Barrena and his supplier, Cortina, operated out of Miami, Evans's crack distribution occurred almost entirely in the Western District of North Carolina.

Rodriguez argues that the evidence was insufficient to connect him with the North Carolina conspiracy. But once the government has proved the existence of a conspiracy, it only needs to establish a "slight connection" between defendant and the conspiracy.**3** Id. at 861.

_____

**2** We have considered Rodriguez's other complaints about the admission of the Rule 404(b) evidence, including his challenge to the court's limiting instruction, and we find them to be meritless.
**3** Our use of the term "slight" does not lower the government's burden to something less than "beyond a reasonable doubt," however. The word

7

Thus, a defendant may be convicted of conspiracy "if he . . . understand[s] . . . [its] unlawful nature . .. and willfully joins in the plan on one occasion, . . . even though he had not participated before and even though he played only a minor part." Id. at 858 (internal quotation and citations omitted). Further, a defendant's connection to a conspiracy may be proved by circumstantial evidence. See id. at 857-58.

The trial court denied Rodriguez's motion to acquit based on: (1) Rodriguez's arrival with Cortina at Barrena's apartment on January 29, 1992, where Barrena was to pay Cortina for the 30 kilos of cocaine that Cortina had fronted to Barrena; (2) the question Rodriguez asked, "Where's Miguel?," at Barrena's apartment; and (3) Barrena's statement to DEA agents, after speaking with Cortina, that an associate would accompany Cortina to pick up the cash at Barrena's apartment. Rodriguez argues that this evidence was insufficient to prove that he joined the North Carolina conspiracy. It merely puts him at the scene of a crime and does not prove he was anything more than an innocent bystander. There is more to the story, however. We conclude that other circumstantial evidence, coupled with the evidence relied upon by the trial court, was sufficient to lead a reasonable jury to conclude that Rodriguez joined the North Carolina conspiracy.

Rodriguez's mere presence at the scene of a drug-related transaction does not prove he was involved in a conspiracy. However, his actions show that he was more than just an innocent bystander. First, he drove Cortina to Barrena's apartment and brought firearms along with him. Drug dealers often use firearms to protect their money and drugs, and a jury could infer from their presence that Rodriguez knew of the impending exchange of cash and brought the firearms along to protect himself and Cortina after they obtained the cash. Second,

_____

"slight" does not describe the quantum of evidence that the government must adduce to prove a defendant's connection with the conspiracy, but rather the degree of the defendant's connection with the conspiracy. See Burgos, 94 F.2d at 861. We use "slight" to emphasize that a defendant may join a conspiracy without knowing its full scope, without participating in all of its overt acts, and without being a member from beginning to end. See id.

8

Rodriguez's question, "Where's Miguel?," indicates that Rodriguez knew the exchange of cash was related to a drug transaction. Rodriguez's expectation that Barrena's brother Miguel, who was Barrena's contact with Cortina, would be present at the meeting suggests that Rodriguez knew why Barrena was paying Cortina. From this, a jury could conclude that Rodriguez knew exactly why Cortina was going to Barrena's apartment on January 29.

Of course, a defendant cannot be convicted of conspiracy simply because he knows of its existence and its unlawful ends. The defendant must join the conspiracy to be convicted. Here, the testimony of Oropeza and Agent Camacho concerning Rodriguez's prior drug activities in Florida with (among others) Cortina was probative of Rodriguez's intent. From this testimony a reasonable jury could conclude that Rodriguez was not just Cortina's driver, but rather Cortina's associate in the drug business. Indeed, that is what Barrena told the DEA agents after he spoke with Cortina -- that an associate of Cortina's would accompany him (Cortina) to Barrena's apartment. This evidence (the Rule 404(b) evidence combined with the other evidence discussed above) was sufficient to lead a reasonable jury to conclude, beyond a reasonable doubt, that Rodriguez knowingly and voluntarily joined the North Carolina conspiracy by helping Cortina obtain drug proceeds from Barrena.

Rodriguez argues that he could not have joined the North Carolina conspiracy after Evans, Barrena and Escobar were arrested. On January 29, 1992, he argues, the other participants in the drug sale, Barrena and Evans, were not co-conspirators because they were working for the government. One cannot be convicted of conspiracy if his only "co-conspirator" is an undercover government agent. See United States v. Lewis, 53 F.3d 29, 33 (4th Cir. 1995). However, the government's failure to prove that Rodriguez joined the conspiracy before Evans, Escobar and Barrena were arrested does not render Rodriguez's conviction invalid. The government had to prove that Rodriguez joined the same conspiracy as Evans, Escobar and Barrena, but it did not have to show that Rodriguez joined that conspiracy while they were active. Rodriguez's conviction is valid because Cortina,

9

another member of the North Carolina conspiracy, remained active in the conspiracy on January 29, 1992.**4**

C.

Rodriguez also contends that the delay between his indictment and trial constituted a denial of his statutory and constitutional rights to a speedy trial. First, Rodriguez argues that the time lapse between his indictment on February 6, 1992, and his trial on March 29, 1993, violated the Speedy Trial Act (STA), 18 U.S.C. § 3161, which requires that defendants be tried within 70 days of indictment. The 70-day STA clock does not run continuously, however. It is tolled during delays attributable to continuances granted to either the defendant or the government when the court finds that the continuance would serve "the ends of justice." See § 3161(h)(8)(A). Further, each defendant's STA clock stops for continuances that are properly granted to his co-defendants. See United States v. Sarno, 24 F.3d 618, 622 (4th Cir. 1994); § 3161(h)(7). Moreover, when multiple defendants are joined for trial, the STA clock does not start to run until the last co-defendant has been indicted. See Henderson v. United States, 476 U.S. 321, 323 n.2 (1986); 18 U.S.C. § 3161(h)(7).

Here, beginning on March 24, 1992, the court granted successive continuances to Rodriguez, his co-defendants and the government in order to serve "the ends of justice." These continuances pushed the defendants' joint trial date back from the April 1992 term to the April 1993 term. Rodriguez does not challenge any of these continuances nor did he move to sever his co-defendants. As a result, Rodriguez's STA clock ran for less than 70 days, up through March 24, 1992,

_____

**4** Since we hold that the evidence was sufficient to convict Rodriguez of conspiracy, we reject his claim that venue was improper. A conspiracy may be prosecuted in any district in which an act in furtherance of the conspiracy was committed. See United States v. Al-Talib, 55 F.3d 923, 928 (4th Cir. 1995). Here, even if the trial court erred by failing to instruct the jury on venue, that error was harmless. By finding Rodriguez guilty of joining a conspiracy whose members admitted to distributing crack throughout the Western District of North Carolina, the jury surely found that an act in furtherance of the conspiracy occurred in that district.

10

before it was tolled. Therefore, his rights under the Speedy Trial Act were not violated.

Rodriguez also claims that the fourteen-month delay between his indictment and trial violated his Sixth Amendment right to a speedy trial. We employ a balancing test to determine whether the delay in bringing a defendant to trial violated the Sixth Amendment. We consider: (1) the length of the delay, (2) the reasons for the delay, (3) the timeliness and vigor of the defendant's assertion of his right to a speedy trial, and (4) the degree of prejudice the defendant suffered as a result of the delay. See Doggett v. United States, 505 U.S. 647, 651 (1992); Barker v. Wingo, 407 U.S. 514, 530 (1972). For a defendant to prevail the four factors must, on balance, weigh in his favor. See United States v. Thomas, 55 F.3d 144, 148 (4th Cir. 1995). Applying the test, we find no violation of the Sixth Amendment.

First, we consider the "threshold requirement" of whether the delay from indictment to trial was "uncommonly long." United States v. Grimmond, 137 F.3d 823, 827 (4th Cir. 1998). This factor weighs in Rodriguez's favor. A delay of about one year in bringing a defendant to trial is "unreasonable enough" to implicate the Sixth Amendment speedy trial right. Thomas, 55 F.3d at 149 (quoting Doggett, 505 U.S. at 652 n.1). As a result, we must consider the other three factors to determine whether the delay violated that right. See Doggett, 505 U.S. at 652; Barker, 407 U.S. at 530.

The second factor, the government's excuse for the delay, can be valid, improper, or neutral. See Grimmond, 137 F.3d at 828. An improper reason weighs heavily for the defendant, while a valid reason weighs for the government; a neutral reason weighs slightly against the government because "the ultimate responsibility for such [delays] must rest with the government rather than with the defendant." Id. (quoting Barker, 407 U.S. at 531). Here, most of the delay in bringing Rodriguez to trial was attributable neither to Rodriguez nor to the government but to continuances granted on the motion of various co-defendants. Rodriguez objected to each motion, but the continuances to serve "the ends of justice" cannot be blamed on the government. In fact, the only continuance the government obtained on its own motion was done at a co-defendant's request. Further, Rodriguez himself asked for and received two continuances which

11

accounted for four of the first six months of his wait for trial. On balance then, the reason for the long (fourteen-month) delay between Rodriguez's indictment and trial was neutral.

The third factor, invocation of the speedy trial right, weighs only slightly in Rodriguez's favor. He asserted his right vigorously by objecting to each continuance granted after September 1992. Of course, up to that time Rodriguez himself had been among those defendants seeking continuances that had caused the delay. The trial court thus cannot be blamed for granting his co-defendants' later motions for continuances over his objection.

Finally, the fourth factor, prejudice, weighs decidedly against Rodriguez. Rodriguez offers no credible claim of prejudice resulting from his wait to be tried. He claims that he was confronted with a new indictment, in Florida, as a result of his wait for trial in North Carolina. Yet the government did not gain any tactical advantage from this new indictment. Nor did it introduce evidence of that indictment at trial. Although the government introduced evidence of Rodriguez's drug dealing activities in Florida, that evidence was known to the government well before the Florida indictment was handed down.

Weighing these four factors, we conclude that the delay of over a year between Rodriguez's indictment and trial did not violate the Sixth Amendment. Rodriguez waited a lengthy period for his trial, but this wait was not too long because the interests of justice required the trial court to grant continuances to several co-defendants. Although he did eventually seek to protect his speedy trial right, he did so after twice moving for (and receiving) continuances. Moreover, Rodriguez shows no prejudice from the delay.[5]

_____

[5] We also reject Rodriguez's claim that he was denied a speedy appeal in violation of the Due Process Clause. We use the same balancing test to evaluate the right to a speedy appeal as we do for the right to a speedy trial. See United States v. Johnson, 732 F.2d 379, 381-82 (4th Cir. 1984). Under this test, a two-year delay between sentencing and appeal constitutes an inordinate delay, one sufficient to raise due process concerns. See id. at 382. However, there was no prejudice from the delay here because Rodriguez's appeal is lacking in merit. See id. at 382-83. Although we recognize that every effort must be made to avoid unjustified delays in the appeals process, Rodriguez's speedy appeal right was not violated in this case.

III.

We have considered all of the other issues Rodriguez raises, including his arguments about jury instructions, double jeopardy and sentencing, and we find no merit to them. Therefore, his conviction is

AFFIRMED.

13