**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                          No. 98-4539

KAY DIANN BARTON,
Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
Frank W. Bullock, Jr., Chief District Judge.
(CR-97-150)

Argued: January 29, 1999

Decided: April 2, 1999

Before WILKINS and KING, Circuit Judges, and
GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stanley Franklin Hammer, WYATT, EARLY, HARRIS,
WHEELER & HAUSER, High Point, North Carolina, for Appellant.
Michael Francis Joseph, Assistant United States Attorney, Greens-
boro, North Carolina, for Appellee. **ON BRIEF:** Walter C. Holton,
Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Kay Diann Barton appeals her conviction and sentence for conspiracy to use unauthorized access devices. <u>See</u> 18 U.S.C.A. § 1029(a)(2), (b)(2) (West Supp. 1998). Finding no error, we affirm.

I.

Barton was a sales representative for a cellular telephone company in Roanoke, Virginia. One of her customers was Patrick Hairston, who operated a garage known as P&S Automotive. Hairston, in turn, was acquainted with Robert Dillard. Beginning in the summer of 1996, Barton, Dillard, and Hairston began to use names and credit information from Barton's customer files to obtain credit fraudulently at area stores. Generally, one of the three would enter a store and apply for a credit card using information from Barton's customer files. If the store approved credit, the conspirator would then use the credit to purchase items. If the store requested picture identification, the conspirator involved would cancel the application. This course of conduct continued until February 1997. The conspirators defrauded numerous stores in Virginia and North Carolina.

Although Barton, Hairston, and Dillard usually were together when they conducted the fraudulent transactions, Dillard sometimes acted on his own. He also recruited other women to fill out false credit applications. On some of these occasions, Dillard telephoned Hairston or Barton to ask for credit information to use, which Barton then provided. On other occasions, Dillard used credit information from other sources. Dillard estimated the total value of items purchased through the conspiracy at $200,000.

At trial, Barton admitted engaging in the fraudulent conduct but claimed that her participation was the product of duress. According

2

to Barton, her customer files were stolen from the locked trunk of her vehicle when she left it at P&S Automotive for repairs. She did not report the theft to her supervisor for fear of a reprimand. Shortly thereafter, she was contacted on the telephone by a man who said he had Barton's customer files and needed "a favor." J.A. 153. Barton terminated the call immediately. The man telephoned Barton several more times, and each time she refused to cooperate. Ultimately, Dillard and another man identified only as "Money" approached Barton in a shopping mall parking lot and demanded that she help them commit credit card fraud using information from the customer files. According to Barton, the men said they needed her help because a white woman could obtain credit without photo identification more easily than could a black man.

Barton also claimed that the men threatened her and her husband. Barton testified that Dillard said he had overheard a conversation between Barton and a potential customer during which the customer had offered to date Barton if she ever separated from her husband. Barton also claimed that Dillard showed her a device that could be placed into a vehicle's gasoline tank to cause it to explode. While Barton was examining the device, Dillard informed her that he was familiar with her husband's schedule. Barton took this as a threat of harm to her husband if she did not cooperate. Throughout the ensuing months, Barton maintained, fear of harm to her husband kept her from contacting the police.

II.

Barton first challenges the instructions given to the jury by the district court. More specifically, she maintains that the district court erred in refusing her requests for a duress instruction and a "missing witness" instruction regarding Hairston. We conclude that neither of the challenged rulings was an abuse of discretion. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996) (explaining that decision whether to give a requested jury instruction rests within the discretion of the district court).

A.

In order "to establish duress the defendant must show that he acted under a reasonable fear of an imminent threat of bodily harm and that

3

he had no reasonable choice but to commit the illegal act." United States v. King, 879 F.2d 137, 139 (4th Cir. 1989). Here, assuming that a threat to a third person could establish a duress defense, the evidence failed to establish that the threat to Barton's husband was imminent. Accordingly, the district court did not err in refusing to give the requested instruction. See United States v. Sarno, 24 F.3d 618, 621 (4th Cir. 1994) (stating that district court does not abuse its discretion in refusing to give duress instruction when evidence is insufficient, as a matter of law, to support a duress defense).

B.

At the time of trial, Hairston, who was not named in the indictment that charged Barton, was in federal custody in Virginia on unrelated charges. Neither the Government nor Barton called Hairston to testify. Barton now maintains that she was entitled to a "missing witness" instruction.

If it lies particularly within the Government's power to produce a witness, and the testimony of that witness would be material to the case, the defendant is entitled to a charge instructing the jury to presume that the witness' testimony would be unfavorable to the Government. See United States v. Brooks, 928 F.2d 1403, 1412 (4th Cir. 1991). Barton's claim of entitlement to such an instruction rests on her contention that because Hairston was in federal custody, he was available only to the Government. This contention, however, is incorrect. Barton could have requested the district court to issue a writ of habeas corpus ad testificandum, thereby requiring Hairston's presence at trial to testify. See 28 U.S.C.A. § 2241(c)(5) (West 1994); Muhammad v. Warden, Baltimore City Jail, 849 F.2d 107, 114 (4th Cir. 1988) (holding that a writ of habeas corpus ad testificandum may be issued extraterritorially by the district court). There is no indication in the record that Barton made such a request. And, the fact that Hairston could be expected to assert his Fifth Amendment privilege against self-incrimination--the basis on which the district court grounded its refusal to give a "missing witness" instruction--did not place it particularly within the Government's power to produce him. See United States v. St. Michael's Credit Union, 880 F.2d 579, 597-98 (1st Cir. 1989).

III.

Next, Barton raises several challenges to her sentence. We conclude that only her argument concerning the amount of loss attributed to her for sentencing purposes is worthy of extended discussion.

Barton contends that the district court erred in upwardly adjusting her offense level by five levels based on an estimated loss of between $40,000 and $70,000. See U.S. Sentencing Guidelines Manual § 2F1.1(b)(1)(F) (1997). Barton concedes that she should be held responsible for all losses resulting from fraud accomplished using information from her customer files, regardless of whether she was present, and all losses resulting from fraud in which she participated. She maintains, however, that the total of these losses amounts to less than $40,000 and that she should not be held accountable for additional losses resulting from fraud accomplished using information that did not come from her customer files and in which she did not actually participate. We conclude that the district court did not commit clear error in calculating the amount of loss attributable to Barton. See United States v. Loayza, 107 F.3d 257, 265 (4th Cir. 1997).

"A defendant convicted of conspiracy should be sentenced not only on the basis of his conduct, but also on the basis of conduct of coconspirators in furtherance of the conspiracy that was known to the defendant or reasonably foreseeable to him." United States v. Williams, 986 F.2d 86, 90 (4th Cir. 1993). Here, there can be no doubt that losses beyond those admitted by Barton were reasonably foreseeable to her. The evidence at trial indicated that on at least one occasion, Barton fraudulently obtained credit using information that did not come from her customer files. And, Barton was aware that Dillard and others engaged in fraudulent activities when she was not present. In light of this evidence, the district court did not commit clear error in finding that the challenged losses--those resulting from fraud committed outside Barton's presence by Dillard and others using information that did not come from her customer files--were reasonably foreseeable to Barton.

5

IV.

In sum, we conclude that the district court did not abuse its discretion in refusing to give the instructions requested by Barton. Additionally, we hold that the court did not commit clear error in determining the amount of loss for sentencing purposes.* Accordingly, we affirm.

<u>AFFIRMED</u>

_____
*We have carefully examined Barton's remaining allegations of error and find them to be without merit.

6