UNITED STATES of America,
Plaintiff–Appellee,

v.

GOLD UNLIMITED, INC.,
Defendant–Appellant.

No. 96–6713.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 10, 1998.

Decided and Filed May 13, 1999.

474

John D. Cline (argued and briefed), Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, Albuquerque, New Mexico, Michael A. Valenti (briefed), Zoppoth, Valenti & Hanley, Louisville, Kentucky, for Appellant.

James R. Lesousky, Jr. (argued and briefed), Terry M. Cushing (briefed), Office of the U.S. Attorney, Louisville, Kentucky, for Appellee.

Before: BOGGS and MOORE, Circuit Judges; and DOWD,* District Judge.

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

BOGGS, J., delivered the opinion of the court, in which DOWD, D.J., joined. MOORE, J. (pp. 489–91), delivered a separate opinion concurring in part and concurring in the judgment.

## OPINION

BOGGS, Circuit Judge.

This appeal involves the conviction of a corporate defendant that advertised a "Get Rich Quick" program. Eager participants flocked in search of galactic profits, but only the corporation quickly got rich, so authorities intervened. We affirm.

### I

David Crowe founded the corporation Gold Unlimited, Inc. The government pressed charges, contending that Gold Unlimited, Inc. ("Gold") operated an illegal pyramid scheme. A jury convicted David, his wife Martha, and Gold of seven counts of mail fraud, one count of money laundering conspiracy, and seven counts of money laundering. After trial, David and Martha fled; they are still on the run. Gold appealed the conviction, alleging error in the district court's jury instructions and in the admission under Federal Rule of Evidence 404(b) of judicial and administrative opinions and of some testimony.

 Of the three defendants, only Gold is a party to this appeal. This section recounts the behavior of Martha and David Crowe, however, because they founded and ran Gold. The Crowes contend that they have always operated legal multilevel marketing (referred to as "MLM" in some documents) programs akin to Amway. MLM programs survive by making money off product sales, not new recruits. In contrast, "pyramid schemes" reward participants for inducing other people to join the program; over time, the hierarchy of participants resembles a pyramid as newer, larger layers of participants join the established structure. Ponzi schemes operate strictly by paying earlier investors with money tendered by later investors.[1] No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, regulators evaluate the marketing strategy (*e.g.*, emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted. In this case, the jury found that Gold and the Crowes knowingly operated an illegal pyramid scheme with the intent to defraud.

### American Gold Eagle

From Fall 1989 to Fall 1991, the Crowes operated American Gold Eagle ("AGE") in North Carolina. David served as CEO for this North Carolina corporation, while Martha acted as Secretary and Treasurer. AGE offered a "Gold Matching Program" to the public: participants placed a $200 down payment on $800 worth of gold and paid the balance by receiving commissions after recruiting new participants. The original participant would pay the $200 and then recruit two separate investment groups into the Gold Matching Program (much like cells in hierarchical organizations, with the original participant at the top and with two branches diverging from the center, each branch containing three recruits). For every group of three that joined the matching program, the original participant received a $300 commission toward the purchase of the laid-away gold. After recruiting two groups (six individuals), the original participant could take the gold or roll over the $600 credit into a new recruitment arrangement that offered a higher ceiling on commissions (conditioned on enrolling more participants, of course).

North Dakota and South Dakota securities regulators found that AGE's practices

---

**1.** The parties and court appear to use "pyramid scheme" interchangeably with "Ponzi scheme." Properly read, the indictment and prosecution's case charge Gold with running both a pyramid and Ponzi scheme, although this opinion follows the district court and refers only to a "pyramid scheme."

violated state laws, and both states issued cease and desist orders. Massachusetts also found a securities violation, labeling the program an illegal pyramid scheme destined for collapse after the saturation of the market for new investors. AGE entered into a settlement, agreeing to pay a fine and to stop conducting business in Massachusetts. North Carolina suspected that AGE operated an illegal pyramid scheme, and the state Attorney General suggested that the company prove its validity by paying off existing obligations before soliciting more recruits. The corporation failed before the state took official action; while the cause of the failure remains unclear, one of the Crowes' daughters testified that problems with vendors resulted in a cessation of gold deliveries to AGE and a concomitant swelling of anger by representatives seeking to realize the fruits of their recruiting efforts. An AGE employee testified that AGE received "literally hundreds" of complaints each day. Before and after AGE's collapse, complaints flooded the office of the North Carolina Attorney General. The Crowes moved to Madisonville, Kentucky and did not act to reimburse the victims of AGE's collapse. Five hundred complaints remain unresolved, alleging losses of $370,000.

### Gold Unlimited, Inc. & "Gold I"

January 22, 1992, saw the incorporation of Gold Unlimited, Inc. ("Gold") as a Delaware corporation based in Madisonville. David Crowe served as the sole officer and director of the closely-held corporation. Martha Crowe acted as office manager for the corporation, which employed a total of 89 individuals over four years. Undaunted by past troubles, the Crowes offered the public the opportunity to participate in Gold's "Gold Earning Program" ("Gold I"). Participants paid $200 toward a $400 gold coin; by recruiting new investors, the original participant earned commissions toward the cost of the coin and could earn cash commissions. At trial, Gold's corporate attorney, William Whitledge, admitted that this plan was "pretty much identical"

to AGE's plan, and the South Dakota Division of Securities Enforcement agreed, calling it "almost identical" and enforcing against Gold the cease and desist order obtained against AGE. In April 1992, the Kentucky Attorney General sued Gold, and the Hopkins Circuit Court enjoined the Crowes from operating Gold. In the opinion, Judge Charles W. Boteler found that Gold I emphasized recruitment of clients, not sales of products, and thus constituted an illegal pyramid scheme. In October 1993, the Crowes and Gold signed a settlement agreement with the state, agreeing to pay restitution to Gold I's participants and submitting to a permanent injunction against operating pyramid schemes and making unrealistic earnings claims. On October 18, 1993, David Crowe pled guilty in an unrelated criminal proceeding to a state charge of false advertising stemming from his activities with Gold I. He received a suspended sentence.

### "Gold II"

Back in business after agreeing to the injunction, the Crowes used Gold Unlimited, Inc. to launch a new marketing plan, referred to at trial as "Gold II." Under Gold II, participants could purchase gold and jewelry from Gold and resell it, or they could join the "Binary Compensation Program." Under the Binary Compensation Program, participants made a $200 down payment towards the purchase of $400 in gold; by recruiting new participants, the original participant earned commissions to pay off the balance and to receive cash payments. Whitledge, Gold's corporate attorney, worked with the Crowes to distinguish Gold II from Gold I. For example, Gold II added more product lines (supplementing Gold I's gold coins with silver coins and gold jewelry), changed manuals, strengthened refund policies, and allegedly attempted to emphasize product sales over recruitment. To ensure compliance with the injunction, Whitledge discussed Gold II with Wendy Delaplane of the state Attorney General's office; Delaplane reiterated her concern

that "a company which put emphasis upon strictly recruiting people rather than moving a product was a pyramid."[2] Whitledge, a solo practitioner, hired an outside legal expert, and the two men concluded that Gold II constituted an illegal pyramid. When Whitledge attempted to discuss his concerns with David Crowe, Crowe told Whitledge that "it was none of [Whitledge's] business and to leave it alone," although Whitledge believes that Crowe eventually "followed my advice."

In February 1995, North Dakota issued a cease and desist order against Gold and assessed a $40,000 civil penalty for, *inter alia*, violating the outstanding cease and desist order binding AGE. South Dakota also enforced its AGE cease and desist order against Gold. Montana filed a cease and desist order. Minnesota alleged that Gold operated an illegal pyramid scheme, and it induced Gold to stipulate that Gold would stop operating in Minnesota and would reimburse residents. On March 14, 1995, a team of federal agents obtained a warrant and searched Gold's offices in Madisonville, seizing records. The United States Attorney obtained a temporary restraining order against Gold, and the company closed. As of March 1995, 96,000 participants had paid $43,000,000 to Gold II, which had disbursed $25,000,000 in commissions. Gold II resulted in sales of 12,628 coins, with a gross profit from the coins of only $552,620. Based on this and other data, the government's expert witnesses agreed that Gold II's financial success depended on the "recruitment of an increasing number of new investors into the Binary Compensation Program," and not on product sales.

On July 12, 1995, the government filed an indictment charging the Crowes and Gold with twenty-three counts. Counts one through seven alleged that the defendants committed mail fraud by operating illegal pyramid and Ponzi schemes (18 U.S.C. § 1341); counts eight through twelve charged the defendants with selling unregistered securities by marketing the Binary Compensation Plan (15 U.S.C. §§ 77e & 77x); counts thirteen and fourteen charged securities fraud (15 U.S.C. §§ 78j & 78ff); count fifteen alleged a money laundering conspiracy to dispose of the proceeds (18 U.S.C. § 1957); counts sixteen through twenty-two charged the defendants with money laundering (18 U.S.C. § 1957); and count twenty-three contained a forfeiture provision (18 U.S.C. 982(b)(1)(A)).

Before trial, the court ruled under Federal Rule of Evidence 404(b) that the government could introduce the state court orders and administrative opinions relating to AGE and Gold: "I believe that it's substantially similar conduct and it's not so remote in time. I think it's relevant to show the plan or knowledge absent mistake or accident, intent [sic]." During trial, the United States argued that the defendants operated a "scheme or artifice to defraud" under the mail fraud statute, 18 U.S.C. § 1341, while the defendants claimed they ran a legitimate multilevel marketing system rather than a pyramid or Ponzi scheme. After the defense rested, the district court instructed the jury that, on the mail fraud counts, "A pyramid scheme constitutes a 'scheme or artifice to defraud' for purposes of this count of the indictment." The jury convicted the defendants of mail fraud (counts one through seven), money laundering conspiracy (count fifteen), and money laundering (counts sixteen through twenty two), and it acquitted the defendants of the securities violations (counts eight through fourteen).

The district court sentenced Martha Crowe to 121 months in prison, David Crowe to 135 months, and fined the corporation $3000, although Gold forfeited its

---

**2.** Whitledge testified that the Crowes asked him to contact Attorneys General across the country to ensure compliance with varied state laws. Whitledge mailed letters to some offices and visited the Attorneys General of Mississippi, Minnesota, Oklahoma, Arkansas, and the Dakotas.

assets after trial and could not pay the fine. The court deferred the forfeiture until after the court-appointed receiver paid restitution to Gold's victims and after the conclusion of a pending civil case. The government allowed the Crowes to remain free until their sentence began, and the Crowes opted not to report to prison on January 21, 1997. Instead, they fled, and presumably are still at large. *See Fugitive Couple Still on the Lam After Year*, ORLANDO SENTINEL, Dec. 20, 1997, at A17 (" 'We don't think they're here anywhere in this country,' George Walsh, a supervisor for the U.S. Marshal's Service in Louisville, said last month."). This court gave the Crowes thirty days to submit to the jurisdiction of the district court, after which it dismissed their appeals. Gold appealed on December 16, 1996; almost one year later, the United States moved to dismiss Gold's appeal pursuant to the fugitive disentitlement doctrine exercised in the dismissal of the Crowes' appeals. This court denied the motion, explaining that, "There has been no judicial finding that Gold Unlimited is the alter ego of the individual defendants or any showing that the disentitlement of the corporation is necessary to protect the interests of the court in the fair administration of justice." We turn to the merits of Gold's appeal. The corporation finds fault with some jury instructions and several evidentiary rulings, and we first consider the jury instructions.

## II

Gold believes that the district court delivered unconstitutional jury instructions relating to the mail fraud convictions under 18 U.S.C. § 1341. While the brief devotes only one section to the jury instructions, a careful reading distinguishes two distinct complaints.

### A. Background

■ 18 U.S.C. § 1341 requires the government to prove three elements: (1)

that the defendant knowingly devised a scheme to defraud; (2) that the defendant did so with the intent to defraud; and (3) that the defendant mailed something or caused another to mail something to implement the scheme. The district court permitted the parties to submit proposed jury instructions, and it crafted a final set of instructions. Gold, for the first time on appeal, takes issue with the following instructions:

> A pyramid scheme is any plan, program, device, scheme, or other process characterized by the payment by participants of money to the company in return for which they receive the right to sell a product and the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users. A pyramid scheme constitutes a scheme or artifice to defraud for purposes of this count in the indictment.[3]

The court gave three other relevant instructions. First, before it discussed the specific counts, it told the jury that "it is up to the government to prove the defendants guilty beyond a reasonable doubt. It is not up to the defendants to prove that they are innocent." Second, shortly before the court delivered the challenged instruction, it informed the jury that:

> In order to sustain its burden of proof for the crime of Mail Fraud ... the government must prove the following three essential elements beyond a reasonable doubt.

> First, that the defendants ... knowingly devised a scheme or artifice to defraud, or knowingly devised a scheme to obtain money or property by means of false pretenses, representations or promises;

> Second, the defendants did so with the intent to defraud;

---

**3.** The defendants submitted jury instructions but did not propose a charge that defined "pyramid scheme" or equated pyramid schemes to schemes to defraud.

and, Third, the defendants mailed something....

A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money—deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises.

Finally, soon after it gave the contested instructions, the court emphasized that, "What must by proved beyond a reasonable doubt is that the defendants knowingly devised or intended to devise a scheme to defraud that was substantially the same as the one alleged in the indictment...."

A careful reading of Gold's appeal reveals two complaints: first, it believes the court improperly defined "pyramid scheme"; second, Gold alleges that the final sentence of the challenged instruction, equating a pyramid scheme with a scheme or artifice to defraud, violates the Constitution. At trial, Gold did not lodge any objections,[4] although Mr. Cox, Martha Crowe's attorney, objected to the giving of any definition of "pyramid scheme." Gold admits that its failure properly to object requires this court to review for plain error.

### B. The Definition of "Pyramid Scheme"

■ Although Gold focuses on the second issue pertaining to the jury instructions, discussed *infra* at Part II.C, it conflates the two issues when discussing whether the second issue constitutes reversible error. The preliminary question remains whether the district court properly defined "pyramid scheme." On appeal, Gold contends that the district court delivered an inadequate definition. The contested instruction defined a pyramid scheme as a "process characterized by the payment ... of money to the company in return for ... the right to sell a product and the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users."

We believe that this instruction raises two questions: whether Gold engaged in a pyramid scheme or in a legitimate activity, and whether a pyramid scheme constitutes a scheme to defraud. We preface our discussion by re-emphasizing that the parties and district court (and many statutes and opinions) use "pyramid scheme" to refer to a combination of pyramid structures (programs that reward participants for inducing other people to join the program) and Ponzi schemes (programs that pay earlier investors with money tendered by later investors). Authorities regulate these combination schemes because the programs will inevitably harm later investors. *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir.) (contending that these schemes employ " 'nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed' ") (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975)), *cert. denied*, 519 U.S. 865, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996); *Koscot*, 86 F.T.C. at 1182 (bemoaning the "serious potential hazards of entrepreneurial chains" and urging the "summary exclusion of their inherently deceptive elements, without the time-consuming necessity to show occurrence of the very injury which justice should prevent"); Note, *Pyramid Schemes: Dare to be Regulated*, 61 Geo. L.J. 1257, 1261–62, 1293 (1973).

Some structures pose less risk of harm to investors and the public, however, and authorities permit these programs to oper-

---

**4.** "A trial counsel is responsible for requesting appropriate jury instructions and objecting to erroneous ones. Objections to jury instructions are necessary to afford the trial judge the opportunity to correct mistakes in his charge." *United States v. Hook*, 781 F.2d 1166, 1172 n. 8 (6th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986).

ate even though the programs contain some elements of a pyramid scheme. Courts and legislatures recognize a distinction between legitimate programs (known as multi-level marketing systems) and illegal schemes. *See, e.g., In re Amway Corp.*, 93 F.T.C. 618, 716 (1979);*State ex rel. Miller v. American Prof'l Mktg., Inc.*, 382 N.W.2d 117 (Iowa 1986); *State ex rel. Ieyoub v. Phipps*, 634 So.2d 51, 53 n. 3 (La.Ct.App.1994); *Schrader v. State*, 69 Md.App. 377, 517 A.2d 1139, 1147 (Md.Ct. Spec.App.1986) (quoting *Utah Legislative Survey*, 1984 UTAH L. REV. 115, 215–16), *cert. denied*, 309 Md. 326, 523 A.2d 1014 (Md.1987); *State ex rel. Stratton v. Sinks*, 106 N.M. 213, 741 P.2d 435, 440 (N.M.Ct. App.1987) ("All multilevels are not considered per se deceptive and unlawful."); Vincent G. Ella, Comment, *Multi–Level or Pyramid Sales Systems: Fraud or Free Enterprise*, 18 S.D. L. REV. 358, 392–93 (1973).

Gold contends that the jury instructions lumped acceptable MLM programs with illegal pyramid schemes; as a corollary, Gold argues that its program contained safeguards to protect against the risks that accompany illegal schemes. This position not only arises for the first time on appeal, but it also apparently contradicts an understanding reached at trial. Mr. Cox, counsel for Martha Crowe, remarked at trial that "a pyramid scheme should not be defined, however the fact that [the court has] defined ["pyramid scheme"] and used the federal definition [sic] the case law is much more to our liking." On appeal, Gold's counsel (who remained silent after Cox's statement), appears to argue that the instructions do not reflect an approved definition under federal law.

The district court's instructions do not appear misleading or incorrect, however. The district court's definition of "pyramid scheme" (by which we and it mean "illegal pyramid scheme") mirrored that used in several other cases. The district court derived the instructions from the FTC's opinion in *In re Koscot Interplanetary,*

*Inc.*, 86 F.T.C. 1106 (1975), which enjoined the defendants from, *inter alia:*

2. Offering, operating, or participating in, any marketing or sales plan or program wherein a participant is given or promised compensation (1) for inducing other persons to become participants in the plan or program, or (2) when a person induced by the participant induces another person to become a participant in the plan or program, *Provided*, That the term "compensation," as used in this paragraph only, does not mean any payment based on actually consummated sales of goods or services to persons who are not participants in the plan or program and who do not purchase such goods or services in order to resell them.

*Id.* at 1187. In a recent civil case, the Ninth Circuit adopted *Koscot*'s explication as its test for the existence of pyramid schemes:

The Federal Trade Commission has established a test for determining what constitutes a pyramid scheme. Such contrivances "are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users" [quoting *Koscot* ]. The satisfaction of the second element of the *Koscot* test is the sine qua non of a pyramid scheme.... We adopt the *Koscot* standard here and hold that the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes.

*Omnitrition,* 79 F.3d at 781–82 (describing the two *Koscot* factors as "the essential features of an illegal pyramid scheme"); *see also Nguyen v. FundAmerica, Inc.,* No. C–90–2090–MHP, 1990 WL 165257, at *1 (N.D.Cal. Aug.21, 1990) (adopting *Koscot*'s test as the definition of a pyramid scheme); *People v. Cooper,* 166 Mich.App.

638, 421 N.W.2d 177, 183 (Mich.Ct.App. 1987) (upholding the constitutionality of an act regulating pyramid promotions, MICH. COMP. LAWS § 445.1528, which resembles the final order issued in *Koscot,* 86 F.T.C. at 1186). The *Koscot* test, reprinted above, does not materially differ from the district court's instruction, which dictated that:

> A pyramid scheme is any plan, program, device, scheme, or other process characterized by the payment by participants of money to the company in return for which they receive the right to sell a product and the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users.

It appears that the district court properly defined "pyramid scheme." [5]

Gold observes that the jury instructions did not inform the jury that a corporation can enact safeguards to ensure that it operates a legitimate MLM program. Gold attacks the definition because it omits the refinement that, "A pyramid is improper only if it presents a danger of market saturation—that is, only if at some point, persons on the lowest tier of the structure will not be able to find new recruits." Gold cites two civil cases that discuss anti-saturation policies, *see Ger–Ro–Mar, Inc. v. FTC,* 518 F.2d 33, 36–38 (2d Cir.1975); *Amway,* 93 F.T.C. at 716–17, and Gold bolsters its position by alleging that the record contains evidence to support a jury finding that the program did not present a "realistic danger of market saturation" and that Gold "implemented anti-saturation policies."

■ One can view Gold's complaint in two ways: perhaps the government bears the burden of proving the risk of saturation as an element of its case, or perhaps Gold should have the ability to prove an affirmative defense that it established anti-saturation policies. If the government has the burden, it appears to have met it. *Koscot*'s second factor—that an illegal pyramid rewards participants for recruitment, not for sales—implies that saturation must occur.[6] Given the district court's instruction that a pyramid exists when a program's rewards relate to recruitment, not product sales, the jury necessarily found the possibility of saturation when it found that the defendants ran a pyramid scheme: " '[T]he presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed.' " *Omnitrition,* 79 F.3d at 781 (quoting *Koscot* ).

■ The government's proof at trial established that Gold ran an illegal pyramid scheme masked with cosmetic anti-saturation policies. Expert witnesses testified that Gold's marketing materials, organizational structure, and recruiting policies marked a program destined for collapse (with concomitant harm to investors). For example, Gold's program, ostensibly predicated on the marketing of gold and jewelry, resulted in a gross profit of only $552,620 from sales of gold coin, yet resulted in the intake of $43 million and the disbursement of but $25 million in "commissions." The government's evidence, focusing on the actual effect of the plan, deserves far more weight than Gold's trial presentation, which relied on the existence of alleged

---

**5.** Gold attempts to distinguish some decisions as civil cases, not criminal, but that approach confuses the appropriate burden of proof (higher in criminal trials, of course) with the proper definition of "pyramid scheme" (a scheme is a scheme, regardless of whether the government or the victims bring the defendant into court). The court properly instructed the jury on the burden of proof, commanding them to find guilt only if the government proved its case beyond a reasonable doubt.

**6.** The Ninth Circuit termed this factor the "sine qua non" of the *Koscot* inquiry. *Omnitrition,* 79 F.3d at 781.

anti-saturation policies shown by the government already to have failed. *See Omnitrition,* 79 F.3d at 783; *SEC v. International Heritage, Inc.,* 4 F.Supp.2d 1378, 1384 (N.D.Ga.1998) ("[T]he critical determination of the legality of [defendant's] operations will not be based on the written plan but on the actual practices of the company."); *Cooper,* 421 N.W.2d at 183 (reiterating this point, and adding that the court should focus on the behavior of a "typical investor" in the plan).

■ We find it more appropriate, however, that a defendant carry the burden of establishing that it has effective anti-saturation programs. Given the grave risks imposed on investors in illegal schemes, the government should have to do no more than prove that the program satisfies the definition of *Koscot. See, e.g., Amway,* 93 F.T.C. at 699 ("There is little doubt that a pyramid distribution scheme should now be condemned even without the demonstration of its economic consequences. The Commission has studied the effects of such 'entrepreneurial chains' and seen the damage they do and a *per se* rule should be used.") (initial decision, affirmed by the FTC opinion, 93 F.T.C. at 735); *Koscot,* 86 F.T.C. at 1182 ("To require too large an evidentiary burden to condemn these schemes can only ensure that future generations of self-made commercial messiahs will dare to be great and dare anyone to stop them."). The alternative—placing the burden on the government—forces the government to wait until after the collapse, as that alternative permits operators to maintain that the absence of collapse proves the success of the anti-saturation policies.

Gold failed to request an instruction on this affirmative defense, and also, as a matter of law, failed to prove that it merited one. As the *Omnitrition* court observed, "The key to any anti-pyramiding rule ... is that the rule must serve to tie recruitment bonuses to actual retail sales in some way. Only in this way can the second *Koscot* factor be defeated." *Omni-*

*trition,* 79 F.3d at 783. The programs in *Amway* and *Ger–Ro–Mar* escaped sanction because they satisfied this anti-pyramiding rule: in both cases, participants earned commissions not through recruitment, but by product sales (their own sales and the sales of their recruits). *See Ger–Ro–Mar,* 518 F.2d at 36 (explaining that the distributors profited from their sales and those of their recruits); *Amway,* 93 F.T.C. at 716 ("It is only when the newly recruited distributor begins to make wholesale purchases from his sponsor and sales to consumers, that the sponsor begins to earn money from his recruit's efforts."). Gold's position conflates saturation of the market for products with saturation of the market for investors and participants, and Gold's plan risked saturation of the latter market. Gold did not prove at trial that it appropriately tied recruitment bonuses to actual retail sales; as a matter of law, it did not show that its tinkering with its policies de-linked recruitment and commissions. The district court did not err by failing sua sponte to instruct the jury on anti-saturation. *Cf. United States v. Bailey,* 444 U.S. 394, 412–13, 413 n. 9, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *United States v. Sarno,* 24 F.3d 618, 621 (4th Cir.1994) ("Whether an affirmative defense is established is a factual issue that is usually a function of the jury, and the trial court rarely rules on a defense as a matter of law. However, where there is insufficient evidence, as a matter of law, to support an element of the affirmative defense, the defendant can be precluded from presenting any evidence of duress to the jury or, if some evidence is already presented at trial, the court can refuse to instruct the jury on the duress defense.") (citing *Bailey* ).

■ Even if we assume that the district court propounded an incorrect instruction and erroneously failed to deliver a different instruction (an instruction never requested by Gold), the record does not reveal plain error:

The Supreme Court and numerous federal courts have repeatedly stated that the plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice. Recourse may be had to the doctrine "only on appeal from a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it." Moreover, an improper jury instruction will rarely justify reversal of a criminal conviction where no objection has been made at trial, and an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law.

*United States v. Hook,* 781 F.2d 1166, 1172–73 (6th Cir.) (citations omitted) (quoting *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). This court reviews the entirety of the district court's charge, *see United States v. Horton,* 847 F.2d 313, 322 (6th Cir.1988), and reverses only to remedy "a grave miscarriage of justice." *United States v. Sanderson,* 966 F.2d 184, 187 (6th Cir.1992). No miscarriage of justice occurred. The challenged instruction governed only a subsection of one of three elements—the knowing devise of a scheme to defraud. The jury still had to find that the defendants acted knowingly when they devised their plan, and that the defendants did so with the intent to defraud. Gold did not object to the instruction, Gold did not object when Mr. Cox pronounced the instruction in accord with federal law, and Gold did not request a different definition or an instruction on an affirmative defense of anti-saturation. The evidence overwhelmingly suggests that Gold did not run a legal multilevel marketing program, but instead operated a combination pyramid and Ponzi scheme that risked inevitable saturation of the market for new participants.

██ In subsequent cases involving alleged pyramid schemes, prudent district courts might supplement the *Koscot* test to reflect the difference between legitimate multi-level marketing and illegal pyramids and Ponzi schemes. For example, most states have statutes defining pyramid schemes and providing for civil and criminal penalties against their operators. Many states prohibit only those schemes that compensate participants "primarily" for the recruitment of new participants, or that "are based primarily" on the recruitment of new participants, as opposed to sales of goods or services. *See* ALA.CODE § 8–19–5(19) (1998); ARIZ.REV.STAT. ANN. § 44–1731(3) (West 1998); IDAHO CODE § 18–3101(2)(a) (1998); 720 ILL. COMP. STAT. ANN. 5/17–7(a) (West 1998); KANSAS STAT. ANN. § 21–3762(a) (1997); LA.REV.STAT. ANN. § 51:361(6) (West 1999); MD. ANN.CODE art. 27, § 233D(a)(4) (1998); N.M. STAT. ANN. § 57–13–2(C) (Michie 1998); N.D. CENT.CODE. § 51–16.1–01(3) (1997); OKLA. STAT. ANN. tit. 21, § 1072(6) (West 1999); TEX. BUS. & COM.CODE ANN. § 17.461(6) (West 1998); UTAH CODE ANN. § 76–6a–2(4) (1998). Some definitions contain closely-related provisions that define pyramids as programs with rewards that are "not primarily contingent" on sales of goods or services. *See, e.g.,* FLA. STAT. ANN. § 849.091(2) (West 1998); MISS.CODE ANN. § 75–24–51(5) (1998); MO. ANN. STAT. § 407.400(5) (West 1998). Other states do not provide any qualifier and resemble *Koscot* in that they only exempt compensation based "solely" or "exclusively" on sales rather than on recruiting. *See* COLO. REV.STAT. ANN. § 6–1–102(9) (West 1998); DEL.CODE ANN. tit. 6, § 2561(1) (1997); GA. CODE ANN. § 16–12–38 (1998); IND.CODE ANN. § 24–5–0.5–2(8) (West 1998); KY.REV. STAT. ANN. § 367.830(4) (Michie 1987); MASS. GEN. LAWS ANN. ch. 271, § 6A (West 1998); ME.REV.STAT. ANN. tit. 17, § 2305 (West 1998); MICH. COMP. LAWS ANN. § 445.1528(2) (West 1998); MINN.STAT. ANN. § 325F.69(2)(a) (West 1998); NEB. REV.STAT. § 87–301(9) (1998); NEV. REV. STAT. § 598.100(3) (1997); N.C. GEN.STAT. § 14–291.2(b) (1997); OHIO REV.CODE ANN. § 1333.91(A) (Banks–Baldwin 1998); OR.

REV. STAT. § 646.609 (1997); PA. STAT. ANN. tit. 73, § 201–2(4)(xiii) (West 1999); S.C.CODE ANN. § 39–5–30 (1998); TENN. CODE ANN. § 39–17–506(b) (1998); VA.CODE ANN. § 18.2–239(a) (Michie 1998); W. VA. CODE § 47–15–1(a) (1998).

■ Having determined that the district court correctly defined "pyramid scheme," we turn to the second question implicitly raised by Gold—namely, whether a pyramid scheme without adequate anti-saturation policies constitutes a "scheme to defraud" prohibited by the mail fraud statute. Unquestionably, an illegal pyramid scheme constitutes a scheme to defraud. In *Omnitrition*, the Ninth Circuit noted that, "An inherently fraudulent pyramid scheme that meets the *Koscot* factors would fall within the[ ] broad definitions of fraud [contained in the mail fraud statute, 18 U.S.C. § 1341, and thus constitute a predicate racketeering act sufficient for the *Omnitrition* plaintiffs to invoke civil RICO]." *Omnitrition*, 79 F.3d at 786 & n. 7; *see also* USSG § 2F1.1, comment. (n.3) (commenting on § 2F1.1(b)(2)(B), a section that requires a two-level sentence enhancement for "a scheme to defraud more than one victim") ("Thus, a wire fraud in which a single telephone call was made to three distinct individuals to get each of them to invest in a pyramid scheme would involve a scheme to defraud more than one victim . . . ."); *United States v. Maze*, 414 U.S. 395, 407, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (Burger, C.J., dissenting); Multi–Level Distributorships and Pyramid Sales Plans, Securities Act Release Nos. 33–5211, 34–9387, 1971 WL 11240, at *4 (Dec. 7, 1971).

### C. The Propriety of Equating A Pyramid Scheme to A Scheme or Artifice to Defraud

■ Gold devotes the majority of its appeal to arguing that the jury instructions violated the Constitution because the instructions contained a mandatory conclusive presumption. The last sentence of the disputed instruction reads, "A pyramid scheme constitutes a scheme or artifice to defraud for purposes of this count of the indictment." No party objected to this sentence at trial, and the trial court even commented (without objection or correction) that "it's my feeling on that is that everyone agrees that a pyramid scheme is a scheme to defraud and that including that in the definition everyone agrees that that is an accurate statement of the law and that's why I included that." The government also contends that, "This is not a matter with which there was any dispute. The parties all agreed with the court that, as a matter of law, a pyramid scheme is a scheme to defraud." On appeal, Gold claims that this instruction constitutes plain error.

■ While Gold cites a host of cases in support of its constitutional claim, *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989), summarizes the underlying contention: "The Due Process Clause . . . denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Jury instructions relieving States of this burden violate a defendant's due process rights." *Id.* at 265 (citations omitted). *Carella* applies equally to the federal government; Gold contends the instruction removed the "scheme or artifice to defraud" element from the prosecution's case because, once the prosecution proved the predicate fact that Gold ran a pyramid scheme, it need not prove that Gold ran a scheme or artifice to defraud.

Gold misreads the case law, which forbids shifting the burden of proof to the defendant—an action that did not occur here. Twice shortly before, and once soon after, the issuance of the challenged instruction, the court reiterated that the prosecution had to prove each of the elements beyond a reasonable doubt. In fact, it instructed that jury that, "What must be proven beyond a reasonable doubt is that the defendants knowingly devised or intended to devise a scheme to defraud that

was substantially the same as the one alleged in the indictment...." *Cf. Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (commanding courts to review in the context of the entire charge any alleged unconstitutional jury instruction presumptions). Gold's cases support only the proposition that a court may not instruct the jury that it can infer intent from the defendant's actions. *See, e.g., Yates v. Evatt,* 500 U.S. 391, 400–01, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) (discussing State presumptions that permitted jurors to presume malice from a defendant's actions) (describing the Court's *Sandstrom–Franklin* line [cited by Gold] as decrying presumptions as "pernicious ... because they shifted the burden of proof *on intent* to the defendant") (emphasis added), *overruled on other grounds by Estelle v. McGuire,* 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Francis,* 471 U.S. at 313 ("The question before the Court in this case is almost identical to that before the Court in *Sandstrom:* 'whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of ... state of mind,' by creating a mandatory *presumption of intent* upon proof by the State of other elements of the offense.") (citations omitted) (emphasis added); *Sandstrom v. Montana,* 442 U.S. 510, 513, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (rejecting the instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts"); *Houston v. Dutton,* 50 F.3d 381, 384–85 (6th Cir.) (disapproving of instruction that read, *inter alia,* "If the State proves beyond a reasonable doubt that a killing has occurred, it is presumed to be malicious unless rebutted by other facts and circumstances to the contrary."), *cert. denied,* 516 U.S. 905, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995).

The instruction on pyramid schemes did not shift the burden of proving intent. The government had to prove, beyond a reasonable doubt, that the defendants knowingly devised a scheme or artifice to defraud. The instructions did not permit or command the jury to infer knowledge from any actions. The court merely explained that, as a matter of law, a pyramid scheme constitutes a scheme or artifice to defraud; thus, by implication, if the jury found that the defendants knowingly devised a pyramid scheme, it would find that the defendants devised a scheme or artifice to defraud. This violated no constitutional provision. An example: Imagine that a law prohibits "knowingly taking a car owned by another." A judge could not instruct a jury to imply knowledge from a defendant's act of driving away in the victim's automobile. The judge could inform the jury that, as a matter of law, a sport-utility vehicle is a "car," and that if the government proves that the defendant stole a sport-utility vehicle, that would satisfy the requirements to find that the defendant stole a car. No burden shifts, no element goes unproven. For this appeal, the crucial question is not "Did a presumption exist?" but "Did the court properly state the law (i.e., does a pyramid scheme constitute a scheme to defraud)?" The answer to that question appears in Part II.B *supra*—the answer is "yes," a pyramid scheme constitutes a scheme to defraud.

### III

We turn from the district court's jury instructions to its evidentiary rulings. At trial, the government introduced a Kentucky state judicial opinion, the cease and desist orders from North and South Dakota and Montana, a Massachusetts complaint and settlement by a state administrative agency, and a stipulation entered into by Gold and the Crowes in a Minnesota state court. *See* Part I *supra,* pp. 475–76. The government admits that it could not present the materials to prove the truth of the matters asserted within, because the opinions constituted hearsay that did not meet any exception. *See, e.g.,* FED. R. EVID. 803(8) (admitting only against the

government, in criminal trials, public records or reports). Instead, the court admitted the opinions and orders to show "the plan or knowledge absent mistake or accident, intent [sic]."[7] The opinions show that six states notified the defendants that they operated illegal pyramid schemes and broke state securities laws (relating to pyramid schemes, in that the laws forbid the selling of investment contracts). The events occurred no more than five years before the genesis of the "Gold II" program; many of the programs' characteristics remained the same across AGE, Gold I, and Gold II; and the 1995 opinions (from North Dakota, South Dakota, Montana, and Minnesota) referred to Gold II itself. *See* Part I *supra,* pp. 475–76.

Gold admits that "trial counsel did not object on hearsay grounds or propose a limiting instruction," but proposes that plain error exists, nonetheless.[8] Gold contends that, although the trial court issued a limiting instruction every time the government tendered an opinion, the instructions did not adequately warn the jury not to consider the opinions for the truth of the charges asserted therein. An examination of the limiting instructions reveals that Gold overstates its case.

The government first admitted the Hopkins Circuit Court's opinion declaring Gold I illegal, and the court order forbidding the Crowes from operating pyramid schemes. The trial court issued this instruction:

> First of all, you are not bound in your determination as to the ultimate guilt or innocence of the defendants by the conclusions reached by Judge Boteler.... You make your own determinations, I

will tell you what the law is and then you find the facts. Secondly, I am allowing it to be introduced *solely* for the purpose of showing, if it does, and as it relates to the defendants [sic] knowledge and their plan. And that's the *only way* you can consider it as to their knowledge and plan. *You cannot consider this evidence for any other purpose.*

(emphases added). When the government introduced the other opinions, the court issued this instruction:

> [T]his is the same type of instruction that I gave to you before about the other evidence. This is evidence that you may consider insofar as it may relate to the defendants [sic] knowledge and plan, but you *cannot* consider this evidence as evidence of their guilt as to the charges that are under this indictment, so you can consider it *only* insofar as it may relate to their knowledge and plan and *only* for those purposes.

(emphases added). Finally, in the closing instructions, the court revisited the opinions, as well as some other testimony discussed *infra* in Part IV at pp. 487–88, 488–89:

> You have heard testimony that the defendants engaged in some conduct other than that charged in the indictment. You cannot consider this testimony as evidence that the defendants committed the crimes that they are on trial for now. Instead, you can only consider it insofar as it may relate to proof of knowledge or plan on the part of the defendant's [sic]. Remember that the defendants are on trial here only for the particular charges in the indictment, not for the other acts. Do not return a

---

7. Citing the defendants' defenses of good faith and lack of knowledge and intent, the court found that the defense strategy "makes it necessary for the government to have to put on evidence ... to show knowledge, show that it was not a mistake, show that it was not an accident ..., show that this was a plan to do exactly what the government says they intended to do."

8. The pretrial transcript suggests that David and Martha Crowe's attorneys may not have lodged a formal objection but did discuss the prejudice likely to accompany the opinions. The trial court conducted a Rule 403 balancing and admitted the opinions, although it stated that it planned to issue limiting instructions.

guilty verdict unless the government proves the crime charged in the indictment beyond a reasonable doubt.

The defendants are on trial only for the particular crimes charged in the indictment. Your job is limited to deciding whether the government has proven the crimes charged.

 Because the defendants denied all elements of the crime, the government properly introduced the opinions under Federal Rule of Evidence 404(b):

> The rule might be stated as follows: where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may by introduced under Rule 404(b).

*United States v. Johnson,* 27 F.3d 1186, 1192 (6th Cir.1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995). Gold nevertheless contends that the court committed plain error because its instructions did not explicitly command the jury not to consider the materials for the truth of the matters asserted in them. Gold does not come close to showing plain error. *Cf. Hook,* 781 F.2d at 1172–73 (defining the plain error standard). Given the defendants' operation of Gold II, opinions of six states that the defendants operated an illegal scheme constitute very probative evidence of knowledge, plan, and intent. The district court conducted a balancing of factors under Rule 403.[9] *Cf. Johnson,* 27 F.3d at 1193 (upholding admission of other acts evidence despite lack of explicit 403 balancing). The district court repeatedly warned the jury to consider the evidence only as to knowledge and plan, and it told the jury not to consider the evidence for guilt, a command that ameliorated any adverse effects that could have occurred if the jury accepted the opinions as true. Further, the court emphasized that the defendants stood trial only for the counts in the indictment, and not for any other conduct. Plain error does not exist merely because minimal additional prejudice accrued when Gold did not benefit from yet another instruction— an instruction it did not request at trial.

## IV

 Gold brings a related Rule 404(b) claim, contending that the district court erred when it admitted testimony that related the Crowes' behavior while running AGE in North Carolina from 1989 to 1991. Gold believes that such evidence fails two different elements of Rule 404(b), as the testimony neither proves a material issue nor passes the balancing test of Rule 403. The disputed testimony came from three employees of AGE: Rhonda Bunker, Michael Cooper, and Wendy Meeder. Cooper testified that David Crowe lied to representatives about the availability of products, claiming that AGE had products in stock, when the warehouse was in fact empty. Cooper also said that Martha Crowe refused to pay for available products and lied to a supplier about payment. Bunker said that Martha Crowe ignored AGE participants' complaints about inadequate supplies of products, and that Martha Crowe directed AGE employees to distribute products unfairly by favoring the representatives with larger recruitment hierarchies (called "down lines"). Meeder testified that Martha Crowe withheld earned commission payments from some members. Gold's attorney objected to this evidence and asked for an ameliorative jury instruction, which the court gave.

> The more authoritative the opinion of illegality, the stronger the inference that the defendants (1) took notice of the illegality (had knowledge) and (2) exhibited their intent to defraud by persisting in their endeavors.

---

**9.** Rule 403 directs the district court to balance probativeness not against prejudice, but against unfair prejudice. Prejudice arises because of the authoritativeness of the opinions of state courts and administrative agencies.

■ This court requires a district court to make three findings before the district court admits evidence under Federal Rule of Evidence 404(b). The district court must find that the prior bad acts occurred (a finding reviewed for clear error); that the evidence helps prove a material issue (a finding reviewed de novo); and that the evidence passes the balancing test of Rule 403 (a finding reviewed for abuse of discretion). *See United States v. Jobson*, 102 F.3d 214, 220 (6th Cir.1996). Gold does not contest the first element, implicitly admitting that the bad acts transpired. Gold directs its attack at the second and third elements.

The district court found that the evidence proves a material issue. Recall that the mail fraud statute, 18 U.S.C. § 1341, requires proof of three elements: (1) the defendant knowingly devised a scheme or artifice to defraud; (2) the defendant did so with the intent to defraud; and (3) the defendant used the mails to implement the scheme. Here, the defendants placed elements one and two at issue by insisting that they operated a legitimate multilevel marketing concern and had no intent to defraud others. *See Johnson*, 27 F.3d at 1192 ("Thus, where the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding any defense the defendant might raise."). The court admitted the evidence for the purpose of proving plan or knowledge.[10] The evidence showed that the Crowes operated AGE deceitfully and that they favored representatives based on recruiting acumen. Given the testimony about the similarity of AGE and Gold I and Gold II, the jury could find that the evidence showed (1) that the defendants knew that Gold II constituted a scheme or artifice to defraud, and (2) that Gold II represented part of an ongoing plan to

defraud others. *Cf. United States v. Brown*, 147 F.3d 477, 482–84 (6th Cir.) (permitting, in 18 U.S.C. § 1341 telemarketing prosecution, introduction of prior bad acts, to prove intent), *cert. denied*, —— U.S. ——, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998); *United States v. Benton*, 852 F.2d 1456, 1467 (6th Cir.) ("Moreover, where evidence of prior bad acts is admitted for the purpose of showing intent, the prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent."), *cert. denied*, 488 U.S. 993, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988); *United States v. Grimes*, 620 F.2d 587 (6th Cir. 1980) (per curiam) (permitting government to prove intent by introducing the prior related crimes of a forgery defendant).

Although the trial court conducted a Rule 403 balancing—the third element of the Rule 404(b) test—the admission of the evidence appears tenuous on this ground. The evidence was extremely probative as to the defendants' intent, but the court did not admit it for that purpose. *Cf. Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 379 (6th Cir.1997) (explaining that 404(b) evidence is especially probative when it relates to fraudulent intent, "which is not easily susceptible of proof"), *cert. denied*, —— U.S. ——, 118 S.Ct. 1561, 140 L.Ed.2d 793 (1998). Instead, the court admitted it—and charged the jury to consider it—only to show knowledge or plan. As to knowledge, the judicial and administrative opinions, *see* Part III *supra*, pp. 485–88, go far to establish that the defendants knew that they ran a scheme to defraud; in light of this evidence, the testimony of AGE employees appears duplicative and prejudicial, in that it paints the defendants as uncaring.[11] *Cf. United States v. Latouf*, 132 F.3d 320, 329 (6th Cir.1997) (finding excessive prejudice be-

---

**10.** This evidence—as opposed to the judicial and administrative opinions—would have served the prosecution better if the government offered it as proof of the defendants' intent to defraud.

**11.** The defendants' mendacity and heartlessness helps prove that they ran a scam, but it goes more to their intent than to their knowledge.

cause, *inter alia*, "other proof was available to render the [404(b) ] testimony ... redundant"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1572, 140 L.Ed.2d 805 (1998); *United States v. Merriweather,* 78 F.3d 1070, 1077–78 (6th Cir.1996) (same).

The judge gave two specific limiting instructions. The day of the testimony, he gave the following instruction:

> Now, that concludes I think the part of the trial that will deal with issues related to American Gold Eagle.... I want to make sure that you realize the extent to which you can use that evidence, and I told you this before and I am just reiterating it again. As you know, the defendants are not on trial here for the actions that they may have committed in North Carolina, first of all.... And whatever they did in North Carolina does not necessarily mean they committed the acts that are charged in this indictment.... You can consider this evidence, however, for the purpose of insofar as it relates to the defendants [sic] plan or knowledge and that's all you can consider it for and you cannot necessarily consider it as evidence of any guilt on the part of the defendants as it relates to this indictment.

This instruction resembles one this court approved in *Latouf,* although we found the *Latouf* instruction insufficient because it was given two full days after the admission of the 404(b) evidence. *See Latouf,* 132 F.3d at 329 & n. 5; *cf. Merriweather,* 78 F.3d at 1077–78 (finding prejudice because, *inter alia,* the court's instruction did not "identify[ ] for the jurors the specific purpose for which the evidence was admissible and limit[ ] their consideration of the evidence to that purpose"). When charging the jury at the end of trial, the judge gave a similar instruction, commanding the jury, in part, not to "consider this testimony as evidence that the defendants committed the crime that they are on trial for now. Instead, you can only consider it insofar as it may relate to proof of knowledge or plan on the part of the defendant's [sic]."

The admission of the challenged witness testimony presents a close call. While the evidence was very probative of intent, the court instructed the jury to consider the evidence only for knowledge and plan, and the judicial and administrative opinions already offered ample evidence of knowledge. Nonetheless, we hold that the district court did not abuse its discretion in admitting the evidence. The court issued two concise limiting instructions. Further, the testimony provided the only evidence of the Crowes' plan to defraud others: while the judicial and administrative opinions showed that they had notice that *others* thought the Crowes engaged in a scheme to defraud, only the witness testimony (which described conversations with the Crowes) established that the defendants took actions indicative of fraud (i.e., favoring prolific recruiters and lying about product availability). When combined with the evidence that Gold II strongly resembled AGE and Gold I, this testimony strongly suggests the existence of a plan to defraud others. Finally, even if the district court abused its discretion, the judicial and administrative opinions, combined with the government's witnesses' expert testimony, provided ample evidence of knowledge, rendering harmless any error. *Cf. Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (determining harmfulness of error by evaluating error in context).

## V

For the above reasons, Gold's conviction is AFFIRMED.

## CONCURRING IN PART

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment.

Unlike the majority, I conclude that the district court erred in instructing the jury that a pyramid scheme, as the court defined the term, necessarily constitutes a scheme to defraud for purposes of the

federal mail fraud statute. I do not believe that this mistake rises to the level of reversible error in this case, however, and thus I concur in the judgment.

The district court properly instructed the jury that conviction under the mail fraud statute, 18 U.S.C. § 1341, requires proof that the defendant knowingly devised a scheme to defraud, that the defendant did so with intent to defraud, and, of course, that the defendant used the mails in carrying out the scheme. *See United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997), *cert. denied*, — U.S. ——, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998). As to the first element, the court instructed the jury as follows:

> A pyramid scheme is any plan, program, device, scheme, or other process characterized by the payment by participants of money to the company in return for which they receive the right to sell a product and the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users. A pyramid scheme constitutes a scheme or artifice to defraud for purposes of this count in the indictment.

Joint Appendix at 573. The problem with this instruction is that a pyramid scheme, as the court defined it, does not necessarily constitute a scheme to defraud. A legitimate program similar to that operated by Amway could fall within the district court's definition, but could contain sufficient safe-guards against saturation to satisfy the FTC and the courts.[1] The majority apparently recognizes that a defendant in Gold's position could show the existence of effective anti-saturation policies, but inexplicably the majority concludes as a matter of law that a pyramid scheme, as defined, constitutes a scheme to defraud.[2]

It is well settled that a jury instruction that relieves the prosecution of the burden of proving each element of the offense violates the defendant's due process rights. *See Carella v. California*, 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989); *Sandstrom v. Montana*, 442 U.S. 510, 521–24, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). I conclude that the contested instruction here largely eliminated the government's burden of establishing the existence of a scheme to defraud. Having found certain elements that often constitute a fraudulent pyramid scheme, the jury was instructed to infer that a scheme to defraud existed. The jury should have been required to find from the evidence that this program in fact constituted a scheme to defraud.

Nevertheless, although I perceive error, I conclude that this error does not require reversal. We apply the plain error standard where, as here, the defendant failed to object to the contested instruction at trial. *See* FED. R.CRIM. P. 52(b); *United States v. Alt*, 996 F.2d 827, 829 (6th Cir. 1993) (reviewing forfeited *Sandstrom* claim under plain error standard on appeal). In my opinion this error is clear, but I do not

---

1. In 1979 the FTC determined that the multilevel marketing program operated by Amway was not fraudulent nor illegal. *See In re Amway Corp.*, 93 F.T.C. 618, 709–17 (1979). Although it does not involve the exact elements described above, the Amway program is essentially a pyramid. Nonetheless, the FTC determined that the plan did not constitute an *illegal* pyramid because certain Amway rules ensured a focus on retailing over pyramiding. It was the effective enforcement of these anti-saturation rules that saved Amway, not the specific structure of the enterprise. While an Amway-like program that happened to pay participants a small fixed fee for bringing in recruits probably would con-stitute a pyramid scheme under the district court's definition, such a program would not constitute a scheme to defraud.

2. A number of states have criminalized the very conduct that the district court defined as a pyramid scheme. However, this criminalization does not imply that such schemes are fraudulent per se. Rather, recognizing that most schemes of this nature are fraudulent and that this specific pyramid structure is not essential for legitimate business operations, these states have justifiably promulgated a broad prophylactic prohibition.

believe that the error was prejudicial or affected the defendant's substantial rights. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (describing the prejudice analysis as a harmless error inquiry with the burden on the defendant). The error affected only one element of the offense—the existence of a scheme to defraud. As the majority correctly notes, even given an erroneous instruction on this point, the jury was still required to find that the defendant acted with the intent to defraud. Moreover, the evidence supporting a finding of a scheme to defraud, as opposed to a non-fraudulent multilevel marketing program, was persuasive. Finally, even if the error affected the defendant's substantial rights, I would argue that we should not exercise our discretion to reverse in this instance. I would do so because I do not believe that the error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* at 736 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936) (alteration in *Olano* )). The question, after all, is close, the defendant had ample opportunity to object, and the evidence against the defendant is considerable.

With the exception of Part II, I concur in the majority opinion. Because I reach the same result through a different path with respect to Part II, however, I respectfully concur only in the judgment of the court.