NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0115n.06
Filed: February 14, 2006

No. 05-5350

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

          v.

JOANNA L. EDIGER,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Middle District of Tennessee

_____/

**Before:**     **GUY, SUTTON, and MCKEAGUE, Circuit Judges.**

**PER CURIAM.**     Defendant Joanna L. Ediger worked for the Tennessee Department of Labor (TDOL) as the Director of the TDOL's Division of Employment and Training. While working for the TDOL, Ediger helped Workforce Strategists LLC (WFS) win a no-bid contract with the TDOL to provide mental health related services to chronically unemployed workers. After she resigned from the TDOL, Ediger worked for and obtained an ownership interest in WFS.

The United States charged Ediger with one count each of mail and wire fraud for her participation in an alleged scheme to award WFS a contract for her own personal gain.

Following a six-day trial, a jury convicted her of both counts and the district court sentenced her to a 36-month term of imprisonment and two years of supervised release. Ediger appeals her convictions and her sentence. After careful review of the record, we conclude that there was sufficient evidence to support her convictions and that the district court did not err in imposing her sentence. Therefore, we affirm.

**I.**

Ediger was the Director of the Division of Employment and Training from July 1998 to August 1999. That division was responsible for administering millions in federal grant money for the education and training of unemployed workers in Tennessee. Ediger oversaw a staff of about 35 employees, and she reported to one of two Deputy Commissioners, each of whom reported to the Commissioner of the TDOL, Mike Magill.

In late summer or early fall 1998, Ediger and TDOL Deputy Commissioner Chip Smith met with Commissioner Magill to discuss entering a sole source contract with a company run by John Stamps, a lobbyist and personal friend of the governor, to provide mental heath-related services for chronically dislocated workers. A "sole source" contract is referred to in the Department of Finance and Administration (DF&A)'s written rules for the approval of contracts. Under those rules, there are only three permissible methods of obtaining a services contract: (1) the "Request for Proposal" process, whereby bids were solicited from vendors through a written solicitation and then competitively evaluated; (2) "Verbal Competitive Negotiation," whereby the competitive process could be handled verbally if the total value of services did not exceed $500; and (3) "Sole Source Negotiation," whereby the contract could be negotiated verbally with a single vender "in lieu of

competitive negotiation only where competitive negotiation would not be feasible or practicable, as in the following cases: (i) The service required is available from only one person or firm; (ii) The contract is with another governmental unit or state agency."

To request a sole source negotiation, departments were required to provide DF&A a memorandum setting forth a "description of the services to be procured" and a "statement of the means of negotiation the state agency intends to employ and the justification for that choice . . . ." DF&A could then approve the request for sole source authorization based upon necessity and compliance with the procedures. *Id.*

Magill authorized Ediger to investigate whether there was justification for a sole source contract with WFS. Ediger prepared a sole source justification memo on about January 19, 1999 for Magill's signature requesting that DF&A authorize TDOL to enter into a contract with WFS. The memo stated that WFS was "the only company in Tennessee that has experience developing a program similar in scope." Magill signed the memo and had it forwarded to DF&A for review.

The Director of Contracts Review for the DF&A, Robert Barlow, sent a memo to Magill on February 19, 1999, indicating that his department needed more information on whether WFS was the only company, not just in Tennessee but anywhere, that could provide the service. Ediger prepared a second sole source justification memo for Magill's signature on June 2, 1999. This second memo stated that other potential vendor programs assisted in job searches but did not include the mental health component that WFS could provide. The memo again claimed that WFS was "the only company in Tennessee that has experience developing and implementing a program similar in scope, with performance-based

guarantees, performance based payments and with the capacity to handle the hard to serve type of customer." *Id.* Magill signed the memo and forwarded it to the DF&A. Robert Barlow contacted TDOL General Counsel Martha Staley to inform her that the second memo did not address his concern raised in his February 7, 1999 response to the first memo. Staley in turn contacted Deputy Commissioner Chip Smith to inform him of the need for further information.

Ediger prepared a third sole source memo on July 15, 1999, in which she stated that she and Chip Smith met with a vendor from Maryland[1], but that they could not meet the necessary time line and their price was three times that of WFS's. She forwarded the memo to Staley, who forwarded it to Barlow at the DF&A.

Contrary to Ediger's assertions in her three memos regarding WFS's experience, WFS had no experience because it was not yet an operational business when Ediger wrote the memos. Around April 1999, John Stamps began discussing the potential creation of a company that would provide psychiatric and group counseling for chronically unemployed persons. In May, Stamps contacted his corporate lawyer about options for creating WFS as a business entity and on May 26, 1999, Articles of Organization for WFS were mailed to the Tennessee Secretary of State's Office for registration. Marcus Burrows, a registered psychiatric nurse who also held a master's degree in business administration, was identified as the Chief Manager and President of WFS and was given a 10% ownership interest. Burrows worked from May until the fall preparing WFS to open for business. It was not

---

[1]The vendor was Sylvan Learning Systems, Ediger's former employer.

until October 1999, after Burrows had been notified that the TDOL contract was approved, that he leased office space, office equipment, and hired a counselor and receptionist. WFS did not open for business until November of 1999.

The same day that Ediger completed the third sole source memo, she informed her superiors that she was resigning to accept a teaching position at Vanderbilt University. She asked to transition out of her position by July 31 because of her August 15 "report date" at Vanderbilt, but she stated that she would be willing to work with TDOL "in whatever capacity is needed in between classes." She worked at TDOL until August 13, 1999.

On August 3, 1999, DF&A approved the TDOL's request to negotiate a sole source contract with WFS "based on the information that was provided." Soon after her departure from the TDOL, while WFS and TDOL were negotiating their contract, Ediger began "consulting" work for WFS. In September, she had her sister prepare a logo for WFS. Also in September, Stamps introduced Ediger to Burrows, and thereafter Ediger emailed Burrows regarding WFS's potential contract with TDOL. On October 14, 1999, Ediger sent Burrows the email that was the basis of the wire fraud charged in Count One of the indictment. The email, a response to a message from Burrows about "red-tape" at the TDOL, stated:

> I told John [Stamps] I was going to call you this week and give you a pep talk. I think you all coming is an excellent idea. It maybe [sic] time for John to get Chip back involved to free things up. When I did the contracting with Texas they finally brought the F&A people to us for a meeting. The Governor's staff got really frustrated by the Workforce Commission people and wanted to get things moving. Maybe Chip could do that in this situation.

> Please hang in there. You are so valuable. I talked with Joan several times and she is talking with Natasha also. We just have to keep the faith. Persistence is what a contract with the government requires.

Let me know if I can do anything from here.

As her email makes clear, Ediger continued to have contact with the TDOL after she resigned her position there. On October 25, 1999, Ediger called the TDOL Director of Technical Assistance Joan Craig and said that Stamps wanted Ediger to attend a meeting between WFS and the TDOL. Ediger did not indicate that she was acting as a consultant to WFS or had any financial interest in WFS. Craig sent an email about the conversation to other TDOL officials, Maria Draper, Elizabeth Houston, and Chip Smith, which stated:

> I just talked to Joanna Ediger. She has been asked by John Stamps to attend the meeting in Chattanooga. She was hesitate [sic] to say yes to attending this meeting, but because she and Mr. Stamps are good friends and she has been involved from the beginning, she is willing and wants to be there as a closure to the project that she started.

Following their receipt of the email, Draper and Houston discussed whether Ediger should attend the meeting since she was no longer a TDOL employee. Draper told Ediger that she could attend the meeting, but she could not represent the TDOL at the meeting. Ediger responded that she understood she did not represent the TDOL any longer but that Stamps would feel more comfortable with her there because she had been involved with the project from the beginning. *Id.*

TDOL entered a contract with WFS in November 1999. The contract provided that WFS would provide services for an anticipated three years at approximately $644,000 per year. On December 2, 1999, at Stamp's instruction, Burrows cut a $1,000 check to Ediger on WFS's bank account. On January 27, 2000, at Stamps's instruction, Burrows cut Ediger a WFS check for $1,500. On February 9, 2000, at Stamps's instruction, Burrows issued a WFS check for $10,000 to Ediger. Stamps told Burrows to backdate the WFS books to make

it appear that the $10,000 payment was actually four $2,500 payments over the previous four months for "consulting." In March 2000, Ediger bought 11,250 units in the company, an 11% ownership right in WFS. Over the course of 2000, an additional 11,250 units were transferred to Ediger. She continued to provide consultation services, visiting WFS's office about once per month, and she served briefly as the executive director of WFS.

The United States charged Ediger with mail fraud arising out of mailing an invoice from WFS to the TDOL on October 2, 2000; wire fraud arising out of the October 14, 1999 email; accepting a bribe; and lying to the Federal Bureau of Investigations (FBI). After a six-day trial, a jury found her not guilty of the bribery and lying to the FBI counts but guilty of one count each of wire and mail fraud. Ediger filed a mid-trial Motion for Judgment of Acquittal and a post-trial Motion for Judgment of Acquittal. The district court denied the motions and subsequently sentenced her on February 14, 2005, to 36 months of imprisonment and 2 years of supervised release. Ediger filed a timely Notice of Appeal on February 22, 2005, challenging the sufficiency of the evidence and the sentence.

## II.

### A.    Sufficiency of the Evidence

"[W]hen the sufficiency of the evidence is challenged on appeal, the standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Swidan,* 888 F.2d 1076, 1080 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original)).

The elements of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341) are essentially the same. *United States v. Daniel*, 329 F.3d 480, 485-86 (6th Cir. 2003). Both require proof of (1) a scheme or artifice to defraud, (2) use of interstate wire or mail communications in furtherance of the scheme, and (3) intent to deprive a victim of money or property. *Id.* "A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money—deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999).

"[T]he scheme to defraud element required under [18 U.S.C.] § 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Daniel*, 329 F.3d at 486 (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)).

The government alleged that Ediger's scheme was to secure for WFS the TDOL contract by false pretenses. The alleged false pretenses were the false statements in the sole source memos and working with the TDOL after her resignation in an effort to secure the WFS contract without disclosing to the TDOL her personal financial interest in WFS. The government further alleged that the invoice and the email were made during and in furtherance of that scheme. Ediger argues that there was insufficient evidence for the jury to convict her of mail and wire fraud for two reasons: (1) there was no evidence from which a jury could have concluded that Ediger possessed the requisite intent to defraud; and (2) the object of the alleged scheme, to obtain authorization to negotiate a sole source contract

between WFS and the TDOL, was complete before Ediger made the allegedly fraudulent communications.

### 1.        Ediger had the requisite *mens rea*

Wire and mail fraud are specific intent crimes, requiring the government to prove not only that Ediger knowingly made a material misrepresentation or knowingly omitted a material fact, but also did so with the "purpose of inducing the victim of the fraud to part with property or undertake some action *that he would not otherwise do absent the misrepresentation or omission*." *Daniel*, 329 F.3d at 487 (emphasis added). Ediger contends that the state would have been inclined to grant WFS the contract regardless of her misrepresentations and omissions because, once the WFS contract was put up for competitive bid, there was no other bidder for the contract, and the evidence showed that WFS fully serviced the contract, received good reviews for its performance, and won annual contract renewals. Her argument fails for two reasons. First, the jury could have reasonably concluded that the state would not have approved a sole source contract with a nonexistent company that was later created only for the purpose of servicing the TDOL contract. Relatedly, the jury could also have reasonably determined that the reason WFS was the only bidder was that they were the only company given the opportunity (through Ediger's fraud) to form for the purpose of fulfilling a certain TDOL contract that was almost guaranteed.

Ediger also argues that the only evidence that could support the inference that she intended to defraud, her work for and ownership in WFS immediately after her resignation from the TDOL, was insufficient to support the jury's determination of her guilt. We disagree. Her personal financial stake in WFS is sufficient to support the inference that she

intended to defraud the state. Furthermore, the fact that Ediger made misrepresentations, a conclusion she does not challenge on appeal, could have supported the inference that she intended the misrepresentations to defraud the state.

### 2.    The communications were in furtherance of the scheme

The communications underlying the mail and wire fraud charges must have been related to the scheme such that "the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing." *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986). Ediger theorizes that the goal of the alleged scheme, to obtain sole source funding, was completed on August 2, 1999, when DF&A approved the source funding for WFS. Since the email was sent October 3, 1999, and the invoice was sent October 2, 2000, they could not have been communicated with the purpose of executing the scheme. The flaw in Ediger's argument is that she construes the scheme, and its date of completion, too narrowly. The object of the scheme was for WFS to receive money from the TDOL contract. The email furthered that goal by helping Burrows establish WFS by assuring him that her contacts within the TDOL would help smooth the way for the award of the contract, and by suggesting an alternate method (using Stamps's influential contacts) to push the contract forward. The mailed invoice, in turn, helped secure the money that was the end goal of the scheme. *See United States v. Serafino*, 281 F.3d 327 (1st Cir. 2002); *United States v. Powers*, 168 F.3d 741 (5th Cir. 1999).

### B.    Sentencing

The base offense level for Ediger's convictions was six. The court added two levels because the offenses involved a misrepresentation that Ediger was acting on behalf of a

government agency, and the court added another two levels because Ediger abused a position of public trust. The government contended that her offense level should be increased by another 16 levels because the loss resulting from Ediger's fraud is properly valued at $1.9 million, the value of three years of WFS's ill-gotten contract with the TDOL. After those enhancements, Ediger's guideline range would have been 63 - 78 months. The district court decided that the loss should be valued at what Ediger gained—$130,000—instead of what the State of Tennessee lost. The court also reasoned that since the statutory maximum on each count was only 60 months, to reach the recommended sentence Ediger would have to be sentenced to the statutory maximum on one count and additional months on the second count, to be served consecutively. The court decided that a sentence including a statutory maximum and a second consecutive sentence is usually reserved for repeat offenders, and it was not warranted here because Ediger was a first-time offender. After reducing the loss amount, the guideline range was reduced to 33 - 41 months. The court sentenced her to 36 months, the middle of the tailored guideline range. Ediger argues that we should vacate her sentence for several reasons, some of which are inconsistent and all of which are unpersuasive.

### 1.      Retroactivity of *Booker*

Ediger was sentenced on February 14, 2005, one month after the Supreme Court issued its decision in *United States v. Booker*, 125 S. Ct. 738 (2005). She contends that because she allegedly engaged in her criminal activity before *Booker*, the district court's application of *Booker* to her sentence violates her due process rights and the rule against *ex post facto* laws. Since Ediger raised this issue during sentencing in the district court, we

review de novo. *United States v. Jones*, 399 F.3d 640, 649 (6th Cir. 2005). In *Booker*, the Supreme Court decided that the mandatory nature of the federal sentencing guidelines violated the Sixth Amendment, and as a result they are no longer mandatory but only advisory. The Supreme Court also explicitly held that its decision would apply to all cases on direct review, cases where the defendants necessarily completed their criminal activities before *Booker* was decided. If *Booker* applies to the sentences of defendants who have already been sentenced (but whose cases are on direct appeal), it is undisputable that *Booker* must also apply to the sentences of defendants like Ediger who committed crimes before *Booker* but were sentenced after *Booker*. *See United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005); *United States v. Rines*, 419 F.3d 1104, 1106-07 (10th Cir. 2005), *cert. denied*, __ S. Ct. __, 2006 WL 37744 (2006); *United States v. Dupas*, 419 F.3d 916, 920-21 (9th Cir. 2005); *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005); *United States v. Scroggins*, 411 F.3d 572, 576 (5th Cir. 2005); *United States v. Fox*, 2006 WL 15381 at *1 (4th Cir. Jan. 4, 2006) (unpublished disposition).

### 2. The District Court Considered the Guidelines Advisory

Ediger next objects to her sentence because she claims that the District Court considered the sentencing guidelines mandatory instead of advisory, in violation of *Booker*. Not only is this argument inconsistent with her first argument, it is without factual basis. The transcript of Ediger's sentencing clearly reflects that the district court knew the guidelines were advisory. In fact, the court relied in part on the advisory nature of the guidelines when sentencing her below the range required by the literal application of the guidelines.

Near the beginning of the hearing, the district court stated: "I think the *Booker* court has made it clear that the Court is to apply the guidelines, consider them and then after doing that can tailor the sentence, if necessary, under 3553(a) to achieve the appropriate sentence." In considering Ediger's objection to the presentence investigation report's loss calculation of $1.9 million, the court decided:

> The guideline literally applies meaning that the intended loss is $1.9 million. But under Section 3553(a), it is the view of [the] Court that the best measure of the actual offense conduct of Ms. Ediger is the amount that she gained under the contract. And I am going to tailor the guideline range sentence under 3553(a) as a result. I think that the $1.9 million intended loss amount overstates the actual offense conduct in this case, the nature of Ms. Ediger's role and the exact circumstances of it. . . .
>
> That would mean that instead of a 16-level enhancement would be a 10-level enhancement and produce an offense level of 20 rather than 26. Guideline range of 33 to 41 months.
>
> . . . .
>
> [T]he Court is going to look to the guideline range of 33 to 41 months, recognizing that I am not bound by that; I am using that only in an advisory way.

In rejecting Ediger's request for a sentence of probation instead of incarceration, the court explained:

> I don't think a sentence of probation is appropriate. I think incarceration is necessary based on your real offense conduct and also to deter the revolving door of public corruption that occurs in government. I think it is important that those in government hear the reverberating clang of the cell door behind them to deter others from engaging in this kind of conduct.

In support of her argument, Ediger focuses on the following isolated statement by the district court: "Based on the findings of the Court, probation is not an option." Read in context with the district court's other statements, it is obvious that it was the district court's

own analysis of Ediger's conduct, not the sentencing guidelines, that convinced the court not

to consider probation as an appropriate sentence.

### 3.    Ediger's sentence was not excessive or unreasonable under 18 U.S.C. § 3553(a)

Ediger's final argument is that her sentence of 36 months was excessive and

unreasonable under the factors enumerated in 18 U.S.C. § 3553(a).[2] Specifically, Ediger

---

[2]18 U.S.C. § 3553(a) provides:

(a) **Factors to be considered in imposing a sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are

argues that the district court did not adequately consider her lack of criminal history, her

status as a mother of two small children, her small role in a scheme she alleged was

orchestrated by her superiors at the TDOL, the letters to the court on her behalf testifying to

her good character,  and her low risk of recidivism.

The reasonableness of a sentence post-*Booker* should be determined by consulting the

factors listed in § 3553(a).  In *United States v. Webb*, 403 F.3d 373, 383-85 (6th Cir. 2005),

*cert. denied*, __ S. Ct. __, 2006 WL 37998, we identified the following circumstances that

would support a finding of reasonableness: (1) the fact that the district court properly

calculated and considered the appropriate guideline range; (2) the fact that the district court

properly considered other pertinent Section 3553(a) factors; (3) the absence of indication that

in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

the sentence was set arbitrarily; (4) the absence of indication that the sentence was based on impermissible factors; and (5) the absence of indication that unreasonable weight was given to any pertinent factor.

We would be hard-pressed to find a district court that sentenced a defendant more reasonably than the one in this case. First, we must emphasize that Ediger's sentence was actually less than that recommended by the guidelines. As the Seventh Circuit has stated, "It is hard to conceive of below-range sentences that would be unreasonably high. . . .[T]he United States would have better claim to be the party aggrieved by the district judge's disposition, and it has not appealed." *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005).

Secondly and equally important, the district court explicitly and carefully considered the factors enumerated in § 3553(a). In considering the first factor, the nature and circumstances of the offense, the court decided that the circumstances required a significantly lower sentencing range. Turning to her criminal history, the district court concluded that because she had no criminal past, it should not impose the guideline-required sentence which would have resulted in sentencing Ediger to the statutory maximum on one of the counts and a consecutively served sentence on the second count. As the district court's quotes in the previous section make plain, the court also took into account the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence. In considering her need for medical care, the court granted her request to delay her term of incarceration for several months, until after she recovered from an upcoming surgery. As also indicated by the language quoted in the

preceding section, the court considered the various types of sentences available, including probation, but decided in favor of incarceration. The court also considered the guideline range, but decided it was too severe to fit Ediger's conduct, and accordingly it tailored it downward. Finally, the district court considered restitution but decided against it.

With respect to the final three indicia of reasonableness endorsed in *Webb*, all exist in this case. The sentence was set out thoughtfully, there is no indication that the sentence was based on impermissible factors, and the court considered the § 3553(a) factors proportionally and in relation to one another. Finally, the court also recognized Ediger's familial role and obligations as a spouse and parent of young children, but decided that the other sentencing considerations outweighed those circumstances, which are regrettably shared by many convicted defendants.

**AFFIRMED**.